# EXHIBIT 9

# In The Matter Of:

*CAREY BRADFORD and CODY BOLEN*
*v.*
*LOGAN'S ROADHOUSE, INC.*

---

# *BOLEN, WILLIAM CODY - Vol. 1*
### *June 5, 2015*

---

**MERRILL CORPORATION**
**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

1  Q.    Do you recall what the content of that

2  conversation was?

3  A.    I know she used to tell me that they would

4  shave her hours off.  You know, she might work 20

5  hours, but they may only pay her for 10 hours of what

6  she was doing.

7         And then they were doing -- I forgot what

8  the whole conversation was, but I do remember that

9  they were telling her -- she was actually working 20

10 hours, but she was only getting paid for 10.

11 Q.    And the only reason you have any knowledge of

12 that is because of what she told you over Facebook,

13 correct?

14 A.    Yes.

15 Q.    You don't have any personal knowledge of what

16 was going on at Alabama?

17 A.    No, uh-uh.  Like I said, I think it was

18 Alabama.  That may be wrong, but I'm almost certain it

19 was.

20 Q.    Just to be clear, which restaurants -- which

21 Logan's restaurants did you work at any time while you

22 were employed?

23 A.    What was that again?

24 Q.    Which Logan's restaurants have you worked at?

25 A.    The One Hundred Oaks, the Hickory Hollow and

Case 3:14-cv-02184  Document 93-9  Filed 07/06/15  Page 3 of 29 PageID #: 1102

 1    the Rivergate location.

 2    Q.      And other than those three locations, you

 3    don't have any personal knowledge of anything that was

 4    going on at any other Logan's locations?

 5    A.      No personal knowledge, no, sir.

 6    Q.      Do you recall anything else about this

 7    conversation with the woman who you thought was from a

 8    store in Alabama?

 9    A.      No.

10    Q.      And you said you had Facebook communications

11    with some of the individuals listed on Exhibit 1?

12    A.      Yes.

13    Q.      Who have you had Facebook communications with?

14    A.      When you talk about communications, as in

15    what?

16    Q.      Well, you mentioned earlier that some of these

17    individuals you had Facebook communications with,

18    correct?

19    A.      Communications, I mean, talking back and forth

20    with them, or just basically saying "Here is the

21    website.  You can go to it and make up your own mind"?

22    Q.      Any of that, sir.

23    A.      Yeah, every one of these.

24    Q.      Every one of them?

25    A.      Yeah.

Case 3:14-cv-02184  Document 93-9  Filed 07/06/15  Page 4 of 29 PageID #: 1103

1  Q.      Any discussion about what hours you would be

2  working?

3  A.      No.

4  Q.      Any discussion about what duties you'd be

5  required to perform?

6  A.      No.  I think when I come back in, they told me

7  about -- I believe it was what training was, and that

8  was it.

9  Q.      You started working with Logan's on or around

10 April 24, 2009; is that right?

11 A.      I think that's -- yes.  I think that's when I

12 signed my paperwork to start.  But I don't think the

13 restaurant actually opened until that following week,

14 the first of May.

15         But I guess they considered you hired

16 once you accepted the position and you signed their

17 stuff, the paperwork and stuff.

18 Q.      So is it fair to say your employment started

19 on or around April 24?

20 A.      Yes, uh-huh.

21         (Document marked as Exhibit 4.)

22 BY MR. STUHLDREHER:

23 Q.      Let me hand you what's been marked as Exhibit

24 4 to your deposition.  This is a copy of the Wage/Hour

25 Acknowledgment you signed when you began your

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 5 of 29 PageID #: 1104

1    employment with Logan's.

2    A.      Right.

3    Q.      If you'd look at the bottom of this document

4    where it says "Signature," that's your signature?

5    A.      It is.

6    Q.      And you signed this document on April 24,

7    2009?

8    A.      I did.

9    Q.      And in the section right above your signature

10   the document says, "By signing this form you

11   acknowledge as follows:  That you have read and

12   understand these policies and will comply with them

13   while employed at Logan's Roadhouse or be subject to

14   discipline up to and including separation from

15   employment"?

16   A.      That's correct.

17   Q.      And that's what you agreed to when you signed

18   this?

19   A.      I signed it, yes, sir.

20   Q.      And that's what you agreed to when you signed

21   it?

22   A.      Yes, sir.

23   Q.      And the policies that you agreed to follow

24   were the policies listed in items No. 1 through 6 on

25   this document; is that right?

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 6 of 29 PageID #: 1105

1    A.        What was that again?

2    Q.        Sure.   When you signed this wage hour

3    acknowledgment, you agreed to follow certain policies,

4    and then you understood those policies, right?

5    A.        Yes.

6    Q.        And the policies that you had read and agreed

7    to follow were the policies listed in Nos. 1 through 6

8    on this document; is that right?

9    A.        Yes, sir.

10   Q.        And you understood at all times while you were

11   employed by Logan's that the policies that are listed

12   on this document were Logan's policies, correct?

13   A.        That's correct.

14             (Document marked as Exhibit 5.)

15   BY MR. STUHLDREHER:

16   Q.        I'll hand you what's been marked as Exhibit 5

17   to your deposition.   This is a copy of a document

18   that's titled "Logan's Roadhouse, Inc. Hourly Team

19   Member Handbook Statement of Receipt and Opportunity

20   to Review"?

21   A.        Yes.

22   Q.        And that's your signature at the bottom of the

23   document?

24   A.        It is.

25   Q.        And you signed this document on April 24,

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 7 of 29 PageID #: 1106

1    2009?

2    A.      It is.

3    Q.      And you agreed with the statements included in

4    this document when you signed it, right?

5    A.      I did.

6    Q.      And basically what this document says is that

7    you have received a Logan's Hourly Team Member

8    Handbook and have had the opportunity to read the

9    policies that are included in that handbook?

10   A.      That's correct.

11   Q.      And it also says that you agree to the

12   policies in the handbook and that it was your

13   responsibility to keep up with any changes Logan's

14   made to the handbook?

15   A.      That's correct.

16   Q.      And you agreed to that?

17   A.      Yes.

18   Q.      And those are true statements?

19   A.      Yes.

20                   (Document marked as Exhibit 6.)

21   BY MR. STUHLDREHER:

22   Q.      I'll hand you what's been marked as Exhibit 6

23   to your deposition, and this is a copy of certain

24   sections of Logan's Hourly Team Member Handbook that's

25   dated April 1st, 2012?

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 8 of 29 PageID #: 1107

1   Q.      I'm not asking about those other pages, sir.

2   I'm just asking about these particular pages.

3   A.      Then this isn't the handbook.  This is not a

4   handbook.  You can't just give me -- I can't go to a

5   book and tell me this is a book and give me certain

6   pages that's, you know, taken out.

7            You are giving me -- I mean, I don't know

8   how many pages the handbook is.  But you have given me

9   not even a tenth of what that handbook is, so I

10  can't -- you can't just pick and choose what you want

11  to pick in there.  If you want to hand me the

12  handbook, hand me the whole handbook.

13  Q.      I'm just asking you about those specific

14  policies, though.  I'm not asking you about the rest

15  of the handbook.

16  A.      I don't know.

17  Q.      You don't know one way or the other whether

18  these were or were not Logan's policies?

19  A.      I don't know.

20  Q.      You just don't know?

21  A.      No, sir.

22  Q.      Did you attend any training at any time while

23  you were employed at Logan's?

24  A.      Yes, I did.

25  Q.      When did you attend training?

Case 3:14-cv-02184  Document 93-9  Filed 07/06/15  Page 9 of 29 PageID #: 1108

1    A.       I believe it was May the 1st of 2009.

2    Q.       How long did that training last?

3    A.       It started on a Sunday.  We had a meet and

4    greet that Sunday night, and I think it went through

5    that following Saturday.

6    Q.       How much time during each of those days did

7    you spend attending training?

8    A.       Without records, I don't know.

9    Q.       You reported the time that you spent in

10   training --

11   A.       Yes.

12   Q.       -- on your time records at Logan's?

13   A.       Yes, sir.

14   Q.       And you were paid for that time that you spent

15   during that training?

16   A.       Yes.

17   Q.       Do you recall how you were paid?

18   A.       By check.

19   Q.       Do you recall the amount you were paid?

20   A.       I don't.

21   Q.       How many people attended that training with

22   you?

23   A.       All of the new hires, servers, bartenders,

24   hostesses.  I mean, it was a brand new restaurant, so

25   anybody that was coming in was a new hire.  And then,

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 10 of 29 PageID #: 1109

1  A.      No.  I said the majority.  I wasn't the only

2  one.  I said I done the majority of the raining.

3  Q.      So there were other people that did training

4  at One Hundred Oaks during that time period?

5  A.      Ms. O'Brien, like I said, done training as

6  well.  And at that point in time there was -- after I

7  quit, there were other people that had come up and

8  done it.  I know one lady was -- her name was Tonya.

9            But, like I said, I done the majority of

10  the training up until the point I said that it was

11  enough.

12  Q.      Okay.  But there were other people doing

13  training between 2009 and 2014 at One Hundred Oaks?

14  A.      Yes.

15  Q.      And you don't have specific records of which

16  employees you trained versus which employees other

17  people may have trained?

18  A.      No.  I mean, but it's -- I mean --

19  Q.      And you don't have a specific record of the

20  number of hours you spent training?

21  A.      No.  I mean, a lot of times it was off the

22  clock, I mean.

23  Q.      But in terms of the managers who assigned you

24  to do this training, which managers were they?

25  A.      It was the management staff.  There was -- at

1    one point in time there was David there; Tim was

2    there; Ashley was there; Ms. Brei was there.  Kenny

3    was there, the GM.  I mean, all the management, the

4    entire management staff was there.

5    Q.      And we are talking about, in terms of who

6    assigned you to do training, it was just the store

7    management, the local management at One Hundred Oaks?

8    A.      Yes.

9    Q.      No one else?

10   A.      No.

11   Q.      And when they assigned you to do this

12   training, what did they tell you to do?

13   A.      Go train them.

14   Q.      Did they tell you anything else?

15   A.      No.  I mean, I knew what I was doing.  I knew

16   what the -- what the procedure was from the first day

17   that they were there, what they were supposed to do,

18   the second day, the third day, the fourth day, and the

19   fifth day.

20           I mean, like I said, it was my

21   responsibility -- when they train, I do their

22   classroom time.  And then when they break off, it's my

23   responsibility to go find a server that's capable

24   enough and knowledgeable enough that I feel

25   comfortable with putting them in with the server to

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 12 of 29 PageID #: 1111

1    of that time as well.

2    Q.      And so in terms of -- just so I understand it,

3    the training for the servers was one hour of classroom

4    time?

5    A.      Yes.

6    Q.      Was it always one hour or could it be more or

7    less?

8    A.      Well, what had happened was they got away from

9    it because they got tired of doing it.  They was

10   trying to push people to do training, and they got rid

11   of that classroom time that hour before and you were

12   doing that all at the very end of the shift.  So --

13   Q.      When did they get rid of that hour of

14   classroom time at the start of training?

15   A.      They necessarily didn't get rid of all of it,

16   it's just certain times, if they are short on bodies,

17   they need help, push them through.

18   Q.      And when did that happen?

19   A.      I mean, it happened multiple times throughout

20   the times I was training.

21   Q.      Did you keep a record of what times that

22   happened versus what times it didn't?

23   A.      No.  I did what a manager told me.

24   Q.      But sitting here today, you don't have any

25   records of when you provided the hour of classroom

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 13 of 29 PageID #: 1112

```
 1    bar already knew the food menu itself, so it wasn't as
 2    in-depth going, "Hey, this is what comes with this,
 3    what size we got."  It's mainly, "Hey, learn the
 4    liquors.  This is what we have got.  This is what
 5    beers we carry," and stuff like that.
 6    Q.      And while you were doing that portion of the
 7    training, were you also waiting on customers?
 8    A.      At times, because a lot of them was before,
 9    you know, the shift actually began.  So you were
10    there, you know, an hour going over everything.  Some
11    of the times they'd come in when they'd follow you,
12    when they are following you, like, back behind the
13    bar.  Yes, you are getting tips, you are paid.  At one
14    point in time it was 2.13, and it jumped up to 4.23 an
15    hour.  They changed the bartender's pay.
16    Q.      When did that occur?
17    A.      A year and a half ago.  Year and a half --
18    less than two years ago.  I don't recall, to be
19    honest.  I just know they implemented a tip pool
20    system and went from there.
21    Q.      I want to kind of take the bartender training
22    step by step --
23    A.      Okay.
24    Q.      -- if we can.
25    A.      Yeah.
```

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 14 of 29 PageID #: 1113

1    Q.      So let's just focus on that first step when

2    you are going over the drink menus and things like

3    that.

4    A.      Okay.

5    Q.      How long did that take?

6    A.      You are talking about when I'm doing another

7    bartender, or when I'm bartending and they bring new

8    hires in that was going, "Hey, you got a day that you

9    done alcohol class"?  Which one do you want?

10   Q.      Is there a difference?

11   A.      Well, I mean, I just want to make sure that we

12   are -- I mean, one, you are basically, you know,

13   sitting down with somebody, and another one you are

14   basically behind the bar showing them everything.

15   Q.      Okay.  In which case are you sitting down with

16   somebody?

17   A.      When it's a new hire.  Or not necessarily

18   sitting down.  Basically, they would come in at 10:00,

19   I wouldn't be able to clock in.

20           They'd say, "While you are opening up, I

21   need you to train this person, tell her what beer,

22   what glasses go in what, what wines, what beer, what

23   liquor we have got."

24   Q.      Okay.  Let's take a new hire.

25   A.      Okay.

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 15 of 29 PageID #: 1114

1   Q.      The first time they come in when you are going

2   over the drink menus and everything with them.

3   A.      Okay.

4   Q.      Are you serving customers during this first

5   phase of the training?

6   A.      There was times that you were; there's times

7   that you weren't.  There was times that they would

8   come in on Saturday mornings, you would do it at

9   10:00, not be able to clock in, not clocked in at

10  $2.13 an hour -- or 4.23 an hour as a bartender or as

11  trainer.  They would say, "Hey, train this person and

12  open up your bar at the same time."

13  Q.      And so during that time what were you clocked

14  in at?

15  A.      Sometimes you weren't.

16  Q.      And who did you tell that you were not clocked

17  in?

18  A.      The managers.  "Hey, can I get clocked in for

19  this?"  They said, "We'll get to it."

20  Q.      When did you tell them that?

21  A.      When they asked me to train.

22  Q.      Specifically, when?  You sitting here, do you

23  have recollection of telling a manager that you were

24  not able to clock in during training time?

25  A.      Yeah.  I've got a recollection I told them I

1    wanted to be clocked in when they asked me to train

2    people on --

3    Q.      Okay.

4    A.      -- Saturday mornings.

5    Q.      I'm asking for specifics.  When did that

6    actually occur?

7    A.      I mean, I don't have specific dates, if that's

8    what you are asking.

9    Q.      Okay.  So for bar training, the first step is

10   sometimes you would sit down with a bartender and go

11   over the drink menu with them?

12   A.      No.  You would sit down with the new hires

13   that come in and done that.  Your bartenders you done

14   basically behind the bar.  You give them a recipe

15   book, you show them where all the liquor is at, and

16   they are back there with you.

17   Q.      Okay.  So for folks who have bartending

18   experience, the only training you provided to them was

19   them following you during your shift while you were

20   serving customers?

21   A.      Yes.

22   Q.      And for new hires, for some of them, you had

23   time when you were not serving customers when you

24   would go over drink menus and things like that with

25   them?

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 17 of 29 PageID #: 1116

1   A.      As a bartender you may spend just a couple

2   minutes.

3   Q.      Did you make salads every shift you worked as

4   a bartender at Logan's?

5   A.      Not every shift.

6   Q.      During the shifts when you made salads as a

7   bartender, how long did you spend doing that?

8   A.      It depends if they had product up at the line

9   or not.  So, I mean, you may spend 2 minutes doing it,

10  and you may spend 10 minutes to go back and do it.

11  Because you'd ask the manager, "Hey, there's nobody

12  back there making salads."  "Well, you go back there

13  and do it."

14  Q.      So the time you would spend from shift to

15  shift could vary?

16  A.      Yeah, 2 minutes to 10 minutes.  It depends,

17  like I said.

18  Q.      In terms of the side work that you performed

19  both as a bartender and as a server while you worked

20  for Logan's, that was -- who assigned that work to

21  you?

22  A.      It was a manager.

23  Q.      A manager at the restaurant you worked at?

24  A.      Yeah.

25  Q.      When you were assigned to do particular side

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 18 of 29 PageID #: 1117

1    Q.      Sir, none of your supervisors while you worked

2    at Logan's ever followed you around for the entire --

3    for an entire shift that you worked, did they?

4    A.      Follow?  Follow as what?

5    Q.      Stand by your side and see what you were doing

6    for every minute of every shift you worked?

7    A.      No.

8    Q.      And you never supervised anybody while you

9    were -- while you have been employed at Logan's?

10   A.      No.

11   Q.      And you never spent an entire work shift

12   following any other employee around watching what they

13   were doing every minute, did you?

14   A.      No.

15   Q.      You never clocked another server or bartender

16   into or out of Logan's recording system, did you?

17   A.      The only time is if a manager was sitting

18   right there and she was eating and didn't want to get

19   up, yeah.

20   Q.      So who were you clocking in or out?

21   A.      If there was a server or kitchen guy that was

22   leaving and needed to be clocked out, she's like,

23   "Here, go do this"; the manager.

24   Q.      Who told you to clock them out?

25   A.      The manager.

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 19 of 29 PageID #: 1118

1   Q.      Based on the fact the individual asked to be

2   clocked out because they were leaving?

3   A.      Yes.

4   Q.      And you have never reviewed the paycheck of

5   another Logan's server or bartender?

6   A.      No.

7               (Document marked as Exhibit 7.)

8   BY MR. STUHLDREHER:

9   Q.      I'll hand you what's been marked as Exhibit 7

10  to your deposition.

11              MR. BRYANT:  I have a copy.

12              MR. STUHLDREHER:  Oh, you have got it?

13              MR. BRYANT:  Yeah.

14  BY MR. STUHLDREHER:

15  Q.      This is a copy of the complaint you filed in

16  this lawsuit.

17  A.      Yes, sir, it is.

18  Q.      Have you reviewed this document before today?

19  A.      Yes, sir, I have.

20  Q.      Whose idea was it to file this lawsuit?

21  A.      Well, it was -- Carey is the one that

22  actually -- you know, we had talked about it and found

23  Mr. Jackson, and we talked about it and we thought it

24  was a good idea to meet with him, so we contacted his

25  office and met with him.

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 20 of 29 PageID #: 1119

```
 1    referring to the side work that we talked about
 2    earlier?
 3    A.      Yes.
 4    Q.      Anything else?
 5    A.      Well, I mean, going back there and doing prep
 6    work for salads and stuff that I shouldn't have to be
 7    doing.
 8    Q.      Right.  And that's part of the side work that
 9    we talked about earlier, right?  We talked about
10    making salads?
11    A.      I mean, yeah, you could -- it depends on who
12    you talk to.  I consider it some side work.  But some
13    people may consider it, hey, that's extra duties that
14    I'm having to do that I'm not supposed to be.
15    Q.      I'm just trying to understand, when you refer
16    to non-tip-producing jobs that you were required to
17    work in while clocked in as a tipped employee during
18    your employment, that's a reference to the fact that
19    you were doing this side work?
20    A.      Uh-huh.
21    Q.      Okay.  And that's the only thing that it's in
22    reference to, correct?
23    A.      The non-tip?
24    Q.      Yes, the non-tip-producing work.
25    A.      Yes.
```

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 21 of 29 PageID #: 1120

```
 1   Q.      Okay.

 2   A.      I want to make sure.  Let me bring it up.  I

 3   don't want to tell you wrong.

 4   Q.      I think the allegation is in paragraph 23.

 5   A.      I just found that.

 6   Q.      Okay.

 7   A.      Yes.

 8   Q.      Okay.  So, yes, it's referring to side work?

 9   A.      Yes.

10   Q.      Okay.  You are also claiming in your complaint

11   that you were required to perform side work more than

12   20 percent of your work time?

13   A.      Correct.

14   Q.      And the side work you are referring to there

15   is the side work we have talked about today, correct?

16   A.      Right.  During the -- while I'm clocked in

17   from -- yes.

18   Q.      Okay.  And you never told any Logan's manager

19   that you have felt that you had performed side work

20   that was taking more than 20 percent of your work

21   time, did you?

22   A.      Yes.

23   Q.      You had that conversation with a manager?

24   A.      Yes, I did.

25   Q.      Who did you talk to about that?
```

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 22 of 29 PageID #: 1121

1    A.       Ernie, at the Rivergate location.

2    Q.       When did you have that conversation with

3    Ernie?

4    A.       In November.

5    Q.       November of 2014?

6    A.       Yes, sir.

7    Q.       What did you tell Ernie?

8    A.       He asked me to go back in to scrub baseboards,

9    and I said I'm not doing it.

10   Q.       This was the conversation that you talked

11   about earlier?

12   A.       That's the conversation that we mentioned

13   earlier, yes, sir.

14   Q.       You ultimately did not scrub those baseboards?

15   A.       No.  And then there's been other times, you

16   know, they are telling you to go back and roll more

17   silverware, well, you know, of course, you have to do

18   it.  I mean, that's --

19   Q.       But in terms of your conversations with any

20   supervisor or manager at Logan's about working more

21   than 20 percent of your time on side work, the only

22   conversation you had about that was with Ernie at

23   Rivergate?

24   A.       Yes.

25   Q.       And during that conversation with Ernie at

1    Rivergate, tell me what you said about the 20 percent.

2    A.    That the 20 percent was -- he's actually the

3    one that brought it up.  He says, you know, you can

4    only do like 20 -- we allow you 20 percent of side

5    work doing in your shift.  Well, he's trying to tell

6    me that was in the entire shift, it wasn't just while

7    you were being as a tipped employee.  He's saying, no,

8    that 20 percent covers your entire shift.

9    Q.    Okay.

10    A.    Andrew, another manager at Rivergate, has

11    mentioned that to me.

12    Q.    What has Andrew mentioned?

13    A.    About the 20 percent rule as far as he, you

14    know, is saying it covers your entire shift when you

15    are clocked in.

16    Q.    Specifically what words did he use?  What did

17    he say?

18    A.    He said, you know, by law, you know, you are

19    able to do 20 percent of your side work, running side

20    work -- or I don't remember exactly how he said it,

21    but 20 percent of the side work could be done.

22            But he's talking about the entire -- from

23    the time that you got there to the time that you left.

24    So he's trying to -- he's trying to, you know, imply

25    the work afterwards, I've clocked out, that 20 percent

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 24 of 29 PageID #: 1123

```
 1    covers that and I'm no longer being as a tipped
 2    employee.
 3    Q.      Did anyone at Logan's ever require you to
 4    declare an amount of tips that you did not receive?
 5    A.      Yes.
 6    Q.      Who did that?
 7    A.      Managers.
 8    Q.      When you say "managers," who are you referring
 9    to?
10    A.      Just whoever the supervisor was that morning.
11    I mean, it could be going over your pre-meal.  They
12    come you up and tell you, "Hey, you need to claim more
13    tips."
14                  Well, "You are 8, $10 short, $20 short,
15    you need to claim that today."
16                  "Well, I didn't make it."
17                  "Well, you still need to claim that $20
18    or you are going to be wrote up."
19    Q.      And which manager specifically told you to do
20    this?
21    A.      To claim more tips?
22    Q.      Correct.
23    A.      I mean, Kevin, the one over at Rivergate,
24    brung it up.
25    Q.      Any other managers that told you to do this?
```

Case 3:14-cv-02184  Document 93-9  Filed 07/06/15  Page 25 of 29 PageID #: 1124

1    Q.      It did -- it did need to be?

2    A.      It didn't need to be.

3    Q.      It didn't need to be?

4    A.      No.

5    Q.      Other than the allegations that are included

6    in your declaration, do you believe Logan's did

7    anything else that was wrong with regard to your pay

8    or anyone else's?

9    A.      As in?

10   Q.      Well, other than what's in here, do you

11   believe Logan's has done anything else that's wrong

12   with regard to your pay?

13   A.      I don't know.  I mean, this is what I thought

14   they done wrong.

15   Q.      Okay.  At the time you signed this

16   declaration, and even sitting here today, the

17   allegations that are included in the declaration are

18   all that you believe Logan's --

19   A.      Yes.

20   Q.      -- has done wrong at this time?

21   A.      Yes.

22   Q.      And you knew when you signed this declaration

23   it was going to be presented to the judge in this

24   case, correct?

25   A.      Yes, I did.

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 26 of 29 PageID #: 1125

```
 1   Q.        You knew the judge was going to rely on it?

 2   A.        Yes.

 3   Q.        So as part of your declaration you included

 4   everything that you believe supports your claim in

 5   this lawsuit that Logan's did anything wrong to you or

 6   to anyone else?

 7   A.        Yes.

 8   Q.        When you say in your declaration that you

 9   believe it's a practice of Logan's to require all its

10   tipped employees to perform non-tip-producing side

11   work in excess of 20 percent of their time while

12   clocked into the company's payroll system as a tipped

13   employee --

14   A.        Let me get there.

15   Q.        Sure.

16   A.        Go ahead.

17   Q.        I'm looking at paragraph 8 of your

18   declaration.

19   A.        Okay.

20   Q.        What's the basis for your belief as stated in

21   paragraph 8 of your declaration?

22   A.        Why I believe it's the practice of Logan's to

23   do that?

24   Q.        Yes.

25   A.        They have done it to me.  I've seen they have
```

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 27 of 29 PageID #: 1126

```
 1   done it to every employee that I've ever worked with.
 2   It doesn't change from employee to employee to
 3   restaurant to restaurant.  I've been to three
 4   different ones in a matter of four or five months, and
 5   it was the same thing to every restaurant.
 6   Q.      So your belief with regard to your statement
 7   in paragraph 8 is based on what you experienced
 8   Logan's doing to you in terms of asking you to do side
 9   work?
10   A.      Right.
11   Q.      And also the fact that you saw that other
12   servers and bartenders at the three restaurants that
13   you worked at did side work?
14   A.      Right.  And then, again, like I said, I
15   mentioned earlier some of the people that I talked
16   with that I asked them, "Hey, was this being done in
17   the restaurant?"
18                   "Yes."
19   Q.      Okay.  And, again, with regard to those
20   individuals who worked in restaurants other than the
21   ones you worked in, the only evidence you have that
22   anything went on there or the only evidence you have
23   about what's Logan's practices were at any of those
24   restaurants is what those people told you?
25   A.      Right.
```

 1    was -- that you made, just credit card only, on that

 2    column.

 3    Q.      Okay.  Then so you enter that number plus

 4    whatever your cash tips are?

 5    A.      Yeah.  You say, well, you know, it's showing

 6    here that I made $60 in credit card tips, I made $20,

 7    $30 in cash tips, I'm putting in $90.

 8    Q.      Okay.  So you just enter that one number --

 9    A.      One number.

10    Q.      -- into Logan's tip reporting system?

11    A.      Yes.

12    Q.      And you don't have any personal knowledge of

13    what any other servers or bartenders at Logan's made

14    in terms of tips or pay or any of that, do you?

15    A.      The servers were paid the same and the

16    bartenders were paid their hourly wage, but what they

17    were making in tips, no.

18    Q.      You don't have any idea of what any other

19    server or bartender made in tips at any given time?

20    A.      No.

21    Q.      You said earlier that there were those three

22    to four times you were requested to declare an amount

23    of tips that you didn't actually receive, right?

24    A.      Correct.

25    Q.      And you knew at that time that that violated

Case 3:14-cv-02184   Document 93-9   Filed 07/06/15   Page 29 of 29 PageID #: 1128