# EXHIBIT 11

# In The Matter Of:

*CAREY BRADFORD*

*v.*

*LOGAN'S ROADHOUSE, INC.*

---

*BRADFORD, CAREY*
*June 5, 2015*

---

**MERRILL CORPORATION**
LegaLink, Inc.
20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

```
 1   Q.      Okay.  And did -- next to the
 2   signature, there's a handwritten date.  It
 3   looks like 11/4/14.  Do you recognize that to
 4   be your handwriting, too?
 5   A.      Yes, sir.
 6   Q.      All right.  And did you read this form
 7   before you signed it?
 8   A.      Yes, sir.
 9   Q.      Okay.
10           (Exhibit 3 was marked.)
11   BY MR. HILL:
12   Q.      Okay.  Mr. Bradford, you now have
13   before you a document that's been marked for
14   purposes of identification as Exhibit 3.
15   Exhibit 3 consists of three pages.
16           So directing your attention to the
17   first page of Exhibit 3 --
18   A.      Okay.
19   Q.      -- which bears the heading "Wage and
20   Hour Acknowledgment" at the top of the page.
21   And then asking you to look at the
22   handwritten signature at the bottom of the
23   page.
24   A.      Uh-huh.
25   Q.      Do you recognize that to be your
```

Merrill Corporation                        800-826-0277
       www.deposition.com/southern-california.htm

Case 3:14-cv-02184   Document 93-11   Filed 07/06/15   Page 3 of 19 PageID #: 1146

```
 1    signature?
 2    A.      Yes, sir.
 3    Q.      And the date entry next to your
 4    signature 7/23/12, do you recognize that date
 5    entry to be in your handwriting?
 6    A.      Yes, sir.
 7    Q.      And do you recall signing the original
 8    of this document in or about July 23 of 2012?
 9    A.      Yeah, to the best of my recollection,
10    sir.
11    Q.      Okay.  All right.  Directing your
12    attention to the second page of Exhibit 3,
13    which bears the heading "Anti-harassment and
14    Open Door Policies, Receipt and Understanding
15    Certification."  And again asking you to look
16    at the handwritten signature at the bottom of
17    the page, do you recognize that to be your
18    signature?
19    A.      Yes, sir.
20    Q.      And the date next to the signature of
21    7/23/12, do you recognize that to be in your
22    handwriting?
23    A.      Yes, sir.
24    Q.      And did you sign the original of this
25    document on or about July 23, 2012?
```

```
 1    A.      Best of my recollection, yes, sir.
 2    Q.      Directing your attention to the third
 3    and last page of Exhibit 3, which bears the
 4    heading "Logan's Roadhouse, Inc. Hourly Team
 5    Member Handbook Statement of Receipt and
 6    Opportunity to Review."  And asking you again
 7    to look at the bottom of the page where there
 8    is a printed name and a signature, do you
 9    recognize that to be your signature?
10    A.      Yes, sir.
11    Q.      And a date entry again is 7/23/12.  Do
12    you recognize that date entry to be in your
13    handwriting?
14    A.      Yes, sir.
15    Q.      And do you recall signing the original
16    of this document on or about July 23rd, 2012?
17    A.      Yes, the best I recall.
18    Q.      Okay.  Thank you.
19            (Exhibit 4 was marked.)
20    BY MR. HILL:
21    Q.      All right.  Mr. Bradford, a multipage
22    document has been placed before you which has
23    been marked for purposes of identification as
24    Exhibit 4.  This document consists of 29
25    numbered pages and have a -- and has a cover
```

```
 1   page entitled "Logan's Roadhouse Hourly Team
 2   Member Handbook."  That cover page also
 3   contains the words in the lower right-hand
 4   corner of the page:  "April 1, 2012 replaces
 5   all previous handbooks."
 6           Do you recognize Exhibit 4?
 7   A.      Yes, sir.
 8   Q.      And is this handbook in fact a copy of
 9   the handbook concerning which you
10   acknowledged your receipt on the third page
11   of Exhibit 3?
12   A.      Yes, sir.
13   Q.      Okay.  Did you review this handbook
14   after you received it?
15   A.      Best as I recall, yes, I did.
16   Q.      Okay.  Did you understand that this
17   handbook contained policies and procedures of
18   Logan's with which you were expected to
19   comply?
20   A.      Yes, I do.
21   Q.      Okay.  When did you first start
22   working at Logan's?
23   A.      It was July of 2012.
24   Q.      And where did you start -- first start
25   working --
```

```
 1    A.       Yes, I did.
 2    Q.       Okay.  And was that side work similar
 3    in each of those locations?
 4    A.       They're similar, yes, sir.
 5    Q.       Okay.  Were there differences as well
 6    in each of the three locations?
 7    A.       I mean, like -- yes, there was --
 8    there was little differences.  Like give an
 9    example.  If -- I mean, I don't know if
10    you've ever eaten at a Logan's, but you get
11    bread and you get a butter cup.  All right.
12    Usually the kitchen would make those or the
13    opening people in the mornings.  Well, I went
14    to Antioch, it was part of the side work,
15    your closing side work.  So you were doing --
16    prepping butters for the kitchen, you know.
17    Q.       Okay.  So based on your experience,
18    you would agree that the type of side work
19    required by Logan's could be different in
20    some respects from restaurant location to
21    restaurant location?
22    A.       Yeah.  Certain little things, correct.
23    Q.       Okay.
24    A.       Yeah, you're right.
25    Q.       Who determines what type of side work
```

```
 1    bartenders or servers are going to be
 2    required to do at a particular restaurant
 3    location?
 4    A.      That, I would -- I would -- I would
 5    assume that would be the General Manager who
 6    made those policies.  And -- and they pass
 7    them down to, you know, their managers and
 8    then they follow up on it.
 9    Q.      Okay.  Okay.  So the General Manager
10    at each restaurant location would decide
11    what's going to be required at that location
12    in terms of side work?
13    A.      I would assume that's how it works.  I
14    mean, I never got into that conversation with
15    them, but in my years of experience, that's
16    usually how it worked.  The General Manager,
17    you know, he runs that -- that restaurant and
18    he makes the calls for that.  As far as bar
19    wise, usually they leave it up to the bar
20    manager to make the decisions as far as what
21    side work has to be done.  But they usually
22    have to sit down at the manager meetings and
23    go over it with the General Manager, say,
24    This is what I'm going to do.  Gets the okay.
25    Q.      Okay.
```

```
 1   A.     Because it all -- it all goes right
 2   back to that General Manager.
 3   Q.     Okay.  At -- let's start with One
 4   Hundred Oaks.  You know, you -- you talked
 5   about opening, you know, and closing.  And
 6   I've also, you know, heard the terminology
 7   "running" side work.  I don't know whether
 8   that's something -- does that mean anything
 9   to you "running"?
10   A.     Yeah, I can explain that to you if
11   you'd like.
12   Q.     Okay.  So let's start with -- with One
13   Hundred Oaks.
14   A.     Okay.
15   Q.     And opening duties or, you know, that
16   -- that consisted of side work.
17   A.     All right.  Do you want the bar side
18   work?
19   Q.     Yeah, let's start with the bar.
20   A.     The bar, you would come in at
21   10:00 a.m.  You would --
22   Q.     Let me -- tell -- what's the -- if you
23   came in at 10:00 a.m., what shift would you
24   be working?
25   A.     That would be a morning shift.
```

```
 1   Q.      A morning shift?
 2   A.      Or a double.  It depends if you're
 3   working all day.
 4   Q.      Okay.  So, what, the restaurant opens
 5   at 11:00?
 6   A.      That's correct.
 7   Q.      Okay.  So if you were working the
 8   dayshift as a bartender at One Hundred Oaks
 9   and the restaurant's going to open at 11:00,
10   you'd have been required to show up at 10:00,
11   correct?
12   A.      That's correct.
13   Q.      All right.  And -- and then were there
14   some opening duties that you were required to
15   do before the restaurant opened?
16   A.      Yes, sir.
17   Q.      All right.  And if you were working --
18   if you were the bartender working that
19   dayshift, were you always required to show up
20   at 10:00?
21   A.      Yes.
22   Q.      Okay.  So what are the opening duties
23   that you would perform that consisted of side
24   work?
25   A.      Okay.  When you go in, you would fill
```

```
 1    A.      That's correct.
 2    Q.      So just, you know, kind of walking
 3    through that again.  The variables that could
 4    drive the amount of time that a server spent
 5    on side work, those variables might include
 6    the shift that the server's working, dayshift
 7    or nightshift?
 8    A.      That's correct.
 9    Q.      It could include the management --
10    management's requirements at a particular
11    restaurant, what the management requires in
12    terms of side work at a particular
13    restaurant; that's another variable --
14    A.      That's correct, yeah.
15    Q.      -- that could drive the amount of time
16    needed to do the side work, correct?
17    A.      Correct.
18    Q.      Business volume of the restaurant on
19    any particular shift, that could drive how
20    much time --
21    A.      Of course.
22    Q.      -- that would be required for side
23    work?
24    A.      Definitely.
25    Q.      And I take it that business volume can
```

```
 1   be driven by all sorts of things, like time
 2   of the year?
 3   A.      Time of the year, holidays.  You know,
 4   you have some -- some days are, you know --
 5   it's --
 6   Q.      Price -- price promotions?
 7   A.      Yeah, yeah, kind of.
 8   Q.      Okay.  Amount of time I think you also
 9   indicated can -- you know, required for side
10   work can, you know, vary depending upon the
11   particular server, just how quick they are at
12   doing particular tasks, right?
13   A.      Correct.
14   Q.      Have you ever kept any kind of record
15   of the amount of time you spent on work
16   shifts performing side work?
17   A.      No.
18   Q.      You didn't keep a diary, "I spent this
19   much time this day" --
20   A.      No.
21   Q.      -- "doing side work"?
22   A.      No.
23   Q.      No independent written record of that
24   of any kind?
25   A.      No.
```

CAREY   BRADFORD - 6/5/2015

Page 154

```
 1   Q.      Okay.  You'd have to guess, right?
 2   A.      Yeah.
 3   Q.      For any particular shift, you'd have
 4   to guess, correct?
 5   A.      Correct.
 6   Q.      All right.  Thank you.
 7           I think that, you know, you testified
 8   at the -- a couple hours ago or more now at
 9   the outset of the deposition a little bit
10   about off-the-clock work and that you were --
11   I think you testified that -- well, let me
12   ask it this way.  Were you ever asked by any
13   of your managers at a Logan's restaurant to
14   do work while off the clock?
15   A.      Oh, yes.
16   Q.      Okay.  And did that happen frequently?
17   A.      It did happen frequently, yes, I did.
18   Q.      Did that happen at One Hundred Oaks?
19   A.      Yes, it did.
20   Q.      Did it happen at Antioch?
21   A.      No, not at Antioch.
22   Q.      Did it happen at Spring Hill?
23   A.      Just a couple times.  Not very much.
24   More in the One Hundred Oaks location.
25   Q.      Okay.  So in terms of the off-
```

Merrill Corporation                               800-826-0277
           www.deposition.com/southern-california.htm

Case 3:14-cv-02184   Document 93-11   Filed 07/06/15   Page 13 of 19 PageID #: 1156

CAREY   BRADFORD - 6/5/2015

Page 174

```
1    Q.      Okay.
2    A.      Or did.
3    Q.      In your -- in your complaint, and this
4    is at Paragraph 33 of your complaint, if you
5    want to refer to it.  But, I mean, there's an
6    allegation there that you were required to
7    falsely report tips.
8    A.      That's correct.
9    Q.      Who asked you to falsely report tips?
10   A.      The General Manager and the managers.
11   Q.      Okay.  Let's -- let's go -- were you
12   ever asked to falsely report your tips while
13   working at One Hundred Oaks?
14   A.      Yes.
15   Q.      And who asked -- by name, who asked
16   you to do that?
17   A.      I -- Matt, which was a General
18   Manager.  I've had Ashley, which was a
19   manager.  I've had David, and I've had Sarah.
20   Q.      And in Antioch, did anyone ask you to
21   falsely report your tips?
22   A.      No.
23   Q.      At Spring Hill, did anyone ask you to
24   falsely report your tips?
25   A.      No.
```

Merrill Corporation                                    800-826-0277
              www.deposition.com/southern-california.htm

Case 3:14-cv-02184   Document 93-11   Filed 07/06/15   Page 14 of 19 PageID #: 1157

1  Q.     Okay.  So this is a problem limited to
2  the work you did at One Hundred Oaks,
3  correct?
4  A.     That problem is.
5  Q.     And how did Matt ask you to falsely
6  report your tips?
7  A.     They have a -- they have a sheet that
8  comes out and it says if your tips don't
9  match your sales, you got -- you become on
10 their tip report.  And it tells you how much
11 you need to claim to even it out, even though
12 you didn't make that tip.  You know, because
13 you -- in the restaurant industry, you don't
14 know what you're going to make nightly.  You
15 know, it's impossible.  You have people that
16 tip good and you have people that don't tip
17 good.  You know, that's just the way it is.
18         So you cannot -- you know, even
19 though, like I say, you had a table and they
20 ran a $300 tab up, you have instances where
21 they give you $6.00.  Well, that's nowhere
22 near -- by the time you tip out, things like
23 that, and taxes on it, you know, it doesn't
24 even out.
25         So, I mean, I claim what I -- what I

```
 1    another Logan's server or bartender?
 2    A.    I -- let me think.  No, I haven't.
 3    Q.    You don't have personal knowledge of
 4    the amount of tips received by any other
 5    Logan's server or bartender for any
 6    particular shift, do you?
 7    A.    No, I haven't.  I have never seen a
 8    document with that.  I -- you know, I've
 9    heard servers go, "Oh, I made $90" or "I made
10    $100," things like that.  But never -- no,
11    I've never asked to see a paycheck or
12    anything like -- or seen anyone else's
13    paycheck.  They're actually sealed when they
14    arrive at the store, so....
15              (Exhibit 6 was marked.)
16    BY MR. HILL:
17    Q.    So the document that's been placed
18    before you, Mr. Bradford, that's been marked
19    for purposes of identification as Exhibit 6,
20    is a three-page -- copy of a three-page
21    declaration identified as the Declaration of
22    Carey Bradford, and it's filed in this
23    action.
24              MR. JACKSON:  The one I have said
25    Cody Bolen.
```

```
 1    you include in the calculation of that 20
 2    percent all of the types of side work that we
 3    discussed; and generically, that was sort of
 4    opening preliminary duty side work, running
 5    side work and closing side work?
 6    A.      Correct.
 7    Q.      So all of that went into your
 8    calculation of the 20 percent?
 9    A.      Uh-huh.
10    Q.      And -- well, I'll strike that.
11            Now, when you -- well, strike that as
12    well.
13            Take another look at the Exhibit 6,
14    the declaration.  I may have asked this -- I
15    think I'm asking it in -- a little bit
16    differently now.  But when you signed the
17    original of this declaration, did you read it
18    before you signed it?
19    A.      Correct.
20    Q.      And when you signed it, did the
21    declaration look exactly like the one that
22    you've got in your hand?
23    A.      Correct.
24    Q.      Okay.
25    A.      To the best of my knowledge.
```

```
 1    outside of the running side work.
 2    Q.      Right.  But that -- but the truth is,
 3    Mr. Bradford, that you have no personal
 4    knowledge of how much side work is required
 5    or has ever been required in any restaurant
 6    operated by Logan's under the -- other than
 7    One Hundred Oaks, Antioch and Spring Hill,
 8    correct?
 9    A.      Yeah.  That's the only ones I've
10    worked at.
11    Q.      Okay.
12    A.      I've talked to other people from the
13    other restaurants and they all have the same
14    answer, as well, too.  I mean, they do these
15    same exact -- the side work is pretty much
16    the same.  I mean....
17    Q.      Who have you talked to from another
18    restaurant?
19    A.      A lady named Heidi -- Bender?  Benner?
20    I can look up her last name.  I could look up
21    her last name.  Her name's Heidi.  She was a
22    manager at the Dickson store in Dickson,
23    Tennessee.  And she's no longer with them,
24    but she was telling me, you know, the
25    excessive side work they had and, you know,
```

```
 1   be the only other point in time.  But that's
 2   a written out --
 3   Q.     Okay.  I mean, it's fair to say that
 4   the source --
 5   A.     Is the managers.
 6   Q.     The source of the specific
 7   requirements with regard to side work
 8   performed at any one of the three restaurants
 9   in which you worked was always the management
10   at those restaurants?
11   A.     Correct.
12   Q.     Yeah.
13          We've talked about -- today we've
14   talked about the, you know, three situations
15   in which you were required to work off the
16   clock --
17   A.     Yes, sir.
18   Q.     -- without pay.  And we've talked
19   about the tips that you were required to
20   declare falsely.  And we've talked about the
21   types of side work you performed as a
22   bartender and as a server --
23   A.     That's correct.
24   Q.     -- including preliminary activity,
25   running side work, and your closing activity.
```