# EXHIBIT 13



Not Reported in F.Supp.2d, 2013 WL 1181474 (W.D.Tenn.)
**(Cite as: 2013 WL 1181474 (W.D.Tenn.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Tennessee,
Western Division.
Angela BEARDEN, Allen Pryor, and Jerry Lemberger, on behalf of themselves and other similarly situated persons, Plaintiffs,
v.
AAA AUTO CLUB SOUTH, INC., Defendant.

No. 2:11–cv–03104–JTF–dkv.
March 18, 2013.

Matthew P. Cavitch, The Cavitch Law Firm, Memphis, TN, for Plaintiffs.

Christine Elena Howard, Jason Matthew Leo, Fisher & Phillips, LLP, Tampa, FL, Jeff Weintraub, Fisher and Phillips, LLP, Memphis, TN, for Defendant.

ORDER DENYING PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY CLASS AND FACILITATE NOTICE

DIANE K. VESCOVO, United States Magistrate Judge.

*1 In this lawsuit, the plaintiffs, Angela Bearden ("Bearden"), Allen Pryor ("Pryor"), and Jerry Lemberger ("Lemberger") (collectively referred to as "the plaintiffs" or "the named plaintiffs"), allege that the defendant, AAA Auto Club South, Inc., ("ACS"), violated the Fair Labor Standards Act ("FLSA") by improperly classifying them and other "membership salespeople" as employees exempt from minimum wage and overtime payment. On February 22, 2012, the plaintiffs moved for conditional class certification and to have the court facilitate notice to the putative class pursuant to 29 U.S.C. § 216(b) of the FLSA. The plaintiffs seek to certify a class as follows: "all Membership Salespeople, employed by the Defendant at any time up to three years before the filing of the Complaint." FN1 (Pls.' Mot. to Condit. Certify Class and Facilitate Notice, D.E. 10 at 1.) ACS filed a response in opposition. The plaintiffs filed a reply, and ACS filed a sur-reply. On November 20, 2012, the motion was referred to the United States Magistrate Judge for determination. FN2 (D.E.41.) On February 8, 2013, the court held a hearing on the motion. For the reasons set forth below, the plaintiffs' motion is denied.

> FN1. The plaintiffs originally defined the class as "all Membership Salespeople, employed by the Defendant at any time up to three years before the filing of the Complaint, *whose primary duty and/or activity was inside sales.*" (Pls.' Mot. to Condit. Certify Class and Facilitate Notice, D.E. 10 at 1 (emphasis added).) However, at the hearing on this motion, counsel for the plaintiffs clarified that, for purposes of *conditional* certification, notice would need to be sent to *all* membership salespeople employed during the three-year period because only the salesperson him- or herself would know the facts necessary to determine whether he or she should fall within the ultimate class of those whose primary duty and/or activity was inside sales.

> FN2. Although the parties have not raised the issue, "a motion for conditional certification under the FLSA is a nondispositive matter," and therefore appropriate for a magistrate to decide under 28 U.S.C. § 636(B)(1)A). *Rutledge v. Claypool Elec., Inc.,* No. 2:12–cv–0159, 2013 WL 435058, at *2 (S.D.Ohio Feb. 3, 2013); *accord Summa v. Hofstra Univ.,* 715 F.Supp.2d 378, 384–85 (E.D.N.Y.2010)(finding that a motion for conditional certification was "only a preliminary determination" and "not dispositive" and that it was not included within the exception to a magistrate

judge's authority for motions "to permit maintenance of a class action," *see* 28 U.S.C. § 636(B)(1)A), because the standard for granting conditional certification of a collective action was "materially different" than the standard for certifying a class action under Fed.R.Civ.P. 23 (internal quotation marks omitted)).

### I. FACTUAL AND PROCEDURAL BACKGROUND

ACS is a member club of the American Automobile Association ("AAA"), a not-for-profit organization offering annual memberships for the providing of travel, emergency roadside assistance, and insurance benefits. (D.E. 25 at 1.) ACS operates from approximately seventy offices in Florida, Georgia, and Tennessee. (*Id.* at 2.) ACS employs three types of salespeople: (1) those who sell insurance; (2) those who sell travel services; and (3) those who sell only memberships. (D.E. 1 at 2; D.E. 5 at 2.) Individuals employed by ACS as the third type of salesperson are referred to as "Membership Salespeople" or "Membership Sales Representatives" ("MSRs"). (D.E. 1 at 2.) The three named plaintiffs were employed by ACS as MSRs: Bearden and Pryor at ACS's Memphis, Tennessee location and Lemberger at the club's Melbourne, Florida location. (D.E. 25 at 1.) ACS classifies its MSRs as exempt from the FLSA's minimum-wage and overtime provisions under the "outside sales" exemption. (*Id.* at 2–3.) On December 19, 2011, the plaintiffs filed suit against ACS claiming that ACS improperly classified them as exempt employees. (D.E.1.) On February 22, 2012, Larry Taffel ("Taffel"), another individual formerly employed by ACS as an MSR, filed his consent to join the suit as an opt-in plaintiff. (D.E.9.)

### II. ANALYSIS

The plaintiffs allege that they, and indeed "[m]ost Membership Salespeople [,] devote the majority of their time" to the performance of inside sales services, namely "calling names on telephone lists provided to them by ACS." (Mem. Supp. of Mot. to Condit. Certify Class and Facilitate Notice, D.E. 11 at 4.) As such, the plaintiffs assert that they do not meet the outside-sales exemption requirements and were therefore covered under and protected by the FLSA.

**\*2** The FLSA requires employers to pay minimum wages to all covered employees, 29 U.S.C. § 206, and to pay overtime to all covered employees who work more than forty hours a week, 29 U.S.C. § 207(a)(1). Employers that violate these provisions can be held liable for any unpaid wages and/or compensation plus an equal amount in liquidated damages. 29 U.S.C. § 216(b). To enforce these provisions, employees may bring suit on behalf of themselves and those "similarly situated." *Id.* Section 216 of the FLSA establishes two requirements for representative actions: (1) the plaintiffs must actually be "similarly situated," and (2) all plaintiffs must opt-in to the suit by providing written consent to participating in the collective action. *Id.*

The FLSA does not define "similarly situated," but courts in the Sixth Circuit apply a two-step approach to determine whether a collective action is proper. *Monroe v. FTS USA, LLC,* 257 F.R.D. 634, 637 (W.D.Tenn.2009). Under this approach, the court first determines during the "notice stage" whether the plaintiff has presented sufficient evidence of similarly-situated putative plaintiffs to warrant court-facilitated notice and to conduct discovery. *Id.* No fixed framework exists for determining whether the court should grant conditional certification during the "notice stage." The prevailing practice is to require plaintiffs to establish through evidence at least a "colorable basis" for their claim that the class of putative plaintiffs exists and that the class members are similarly situated. *Pritchard v. Dent Wizard Int'l Corp.,* 210 F.R.D. 591, 596 (S.D.Ohio 2002). The burden is not great; only a modest factual showing is required. *Comer v. Wal–Mart Stores, Inc.,* 434 F.3d 544, 547 (6th Cir.2006) (citing *Roebuck v. Hudson Valley Farms, Inc.,* 239 F.Supp.2d 234, 238 (N.D.N.Y.2002)). This fairly lenient standard accounts for that fact

that only minimal evidence is available to the parties at this stage in the litigation. *Monroe,* 257 F.R.D. at 637. All fact questions and credibility issues are resolved in favor of the moving party. *Id.* (citing *Scott v. Heartland Home Fin., Inc.,* No. 1:05–CV–2812–TWT, 2006 WL 1209813, at *3 (N.D.Ga. May 3, 2006)). If the court is satisfied that the plaintiff has met his or her burden, conditional certification is granted. *Comer,* 454 F.3d at 546–47.

The second stage, referred to as "decertification," follows substantial discovery and typically occurs on motion of the defendant. *Monroe,* 257 F.R.D. at 637–38. At this stage, courts more closely examine the question of whether the particular members of the collective action are, in fact, similarly situated. *Id.* If a class is not made up of similarly-situated plaintiffs, the court decertifies the class.

In support of their request for conditional certification, the plaintiffs here assert that they are similarly situated to the proposed class of MSRs because "their [all class members'] grievances reflect ACS conduct or policy at a company-wide level that affected everyone in the class." (Mem. Supp. of Mot. to Condit. Certify Class and Facilitate Notice 5.)

**\*3** Each of the named plaintiffs has submitted a declaration in support of the motion. In his declaration, Pryor submits that he worked as an MSR for ACS from approximately September 13, 2010, to April 8, 2011. (Allen Pryor Decl., D.E. 13 ¶ 2.) He states that ACS requires its MSRs to attend a week of initial training in Tampa, Florida, at the start of their employment. (*Id.* ¶ 3.) He attests that, during his initial training, he learned nothing about group sales but learned extensively about several different telephone lists that ACS routinely provides to its MSRs and that he received a resource manual that listed instructions for conducting different types of telephone calls from the various lists.[FN3] (*Id.* ¶¶ 3, 5.) Pryor also states that a senior ACS manager at the Tampa training advised him that, in determining how to allocate his time between working the phone lists and conducting outside sales, he (Pryor) "should stick with what works best for him." (*Id.* ¶ 4.) Pryor further states that while employed with ACS, ACS management pressured him to work the telephone lists and urged and even heavily incentivized him to work "phone nights" for a couple of hours at the ACS office one night every workweek. (*Id.* ¶¶ 8, 9.) Pryor attests that he spent most of his working time as an MSR making phone calls off the ACS-provided phone lists, which lists he estimates included approximately one-thousand names per month. (*Id.* ¶ 7.) Because he often had to call a potential customer several times before actually connecting, he avers that he "was pretty much on the phone at all times." (*Id.*) He states that he was disincentivized to engage in group sales because, to the extent he did secure group sales, ACS did not reliably credit him with the sales. (*Id.* ¶ 11.) He describes his inside sales activity as "constant and usual," while his outside sales activity was "occasional and not usual." (*Id.* ¶ 7.) He attests that he, along with all other MSRs, were subject to the same compensation formula: a salary fixed at $500 per week for the first ten weeks of employment, and a purely commission-based salary thereafter, which commission was based on a formula applicable to all MSRs. (*Id.* ¶ 6.) Pryor states that, during his employment, he worked an average of 48.5 hours a week, while his average gross pay per week was approximately $100. (*Id.* ¶ 17.) He also states that ACS never required him to report or keep track of his working hours. (*Id.* ¶ 13.)

> FN3. Pryor does not define the term "group sales." ACS's response defines it as follows: [a sales method] wherein MSRs sell memberships at an employer's site to that employer's employees." (D.E. 25 at 2.)

Bearden has submitted a substantially similar declaration, which states that she worked for ACS from January 10, 2011, to August 12, 2011, for an average of 74 hours per week and an average gross pay of $60 per week, and includes the same certi-

fications and statements as Pryor's declaration. (Angela Bearden Decl., D.E. 12 ¶¶ 2, 16.) Likewise, Lemberger has submitted a substantially similar declaration, which states that he worked for ACS from January 10, 2011, to August 5, 2011, for an average of 58.5 hours per week and an average gross pay of $80 per week, and otherwise contains the same certifications and statements as the declarations of Pryor and Bearden. (Jerry Lemberger Decl., D.E. 14 ¶¶ 2, 17.)

***4** The plaintiffs also rely on, and have submitted, the declaration of Thomas Sachse ("Sachse"), a former "Membership Sales Manager" at ACS's Memphis office. Sachse's declaration reiterates, and in some cases, provides more detail on, the certifications and statements contained in the declarations of the named plaintiffs. In his declaration, Sachse states that he worked for ACS as manager over the MSRs at its Memphis location from June 6, 2010, to September 12, 2011. (Thomas Sachse Decl., D.E. 15 ¶ 2.) He describes the initial training week in Tampa—which training he was also required to attend—as lasting about forty hours, of which ten hours were allocated to instruction on the telephone lists, five hours to instruction on the call centers, four hours to instruction on the computer system, and only one hour to instruction about group sales. (*Id.* ¶ 5.) He states that, during his tenure with ACS, he received from ACS a compilation of telephone lists, typically consisting of 1500 to 2000 names, at the beginning of each month, as well as a separate list of approximately 500 names once a week. (*Id.* ¶ 7.) Sachse attests that it was his "number one responsibility" and the "focus of [his] management" to divide the names on these phone lists among the MSRs that he managed. (*Id.*) He states that, at the time he was hired, there were only two MSRs in Memphis, and for the remainder of his tenure, there was an average of three. (*Id.* ¶ 8.) According to Sachse, this meant that each MSR was required to call approximately 1200 names per month from the phone lists, and, because an MSR typically had to call a number more than once before actually connecting with the potential customer, the result was that MSRs made approximately 5000 phone calls per month. (*Id.* ¶ 8.) As for group sales, Sachse attests that there were "no more than a handful of new group accounts added" during the time he was employed at ACS's Memphis location because MSRs made very little income on group sales compared to sales from the phone lists, and thus "they always gravitated to the lists." (*Id.* ¶¶ 11, 15.) Sachse further stated that the nature of ACS's commission-crediting system encourages MSRs to be at the office: each MSR must make a record in the ACS computer system of any sale for which he or she wishes to receive credit (and, in turn, commission), yet, until mid-August 2011, the computer system could only be accessed on a single desktop computer, at the office. (*Id.* ¶ 13.)

Sachse also states in his declaration that, of the approximately ten different MSRs he managed while employed with ACS, he estimates that nine of them spent "the vast majority of their time" working telephone leads. (*Id.* ¶ 16.) Sachse further states that at one point he received an ACS-distributed spread sheet indicating that eighty-two percent of the 171,768 memberships for which MSRs were responsible that year (2010) had come from *inside,* as opposed to outside, sales. (*Id.* ¶ 23.) He states that, at least during the time he worked for ACS, MSRs "usually" did not earn minimum wage and "never" received overtime compensation. (*Id.* ¶ 17.)

***5** Relying on these declarations, the plaintiffs allege that conditional certification and court-facilitated notice is proper because they, along with the other members of the proposed class, spent most of their working time pursuing telephone leads and recording sales on the in-office computer system, yet they were subject to a compensation formula and policy denying them overtime pay and failing to guarantee them minimum wage. According to the plaintiffs, ACS's reliance on the outside-sales exemption to deny minimum wages and overtime compensation to its MSRs was in blatant disregard of the fact that the type of sales that actually predominated the working time of these MSRs was

decidedly *inside* sales.

In response, ACS argues that the plaintiffs have failed to carry their burden to show that they are similarly situated to the class of potential opt-in plaintiffs because "the evidence establishes that MSRs operate independently at ACS' approximately 70 offices[,] ... engaging in different outside sales methods and different amounts of time spent on various activities, whether out in public places or telephone calling." (Def.'s Resp., D.E. 25 at 2.) According to ACS, telephonic sales are "only one of many sales activities." FN4 (*Id.* at 2 n. 2.) To support these assertions, ACS offers the declarations of eighteen MSRs, some of whom work or worked at the locations (Memphis, Melbourne, and Northlake, Georgia) where either the named plaintiffs or Taffel, the sole opt-in plaintiff, worked, and the remainder of whom work at other ACS locations, including Nashville, Chattanooga, Jacksonville, and Fort Pierce, Florida. In essence, each of the declarants states that the majority of his or her working time as an MSR is spent on sales activities other than making calls from the phone lists. ACS asserts that these declarations reveal each MSR is "unique and structures his or her job differently," and therefore all MSRs are not similarly situated. (*Id.* at 15.) Additionally, ACS has submitted the declarations of a number of its executive and/or managerial employees, which ACS insists support its position that MSRs are "field positions" engaging in outside sales.

> FN4. ACS also has phone centers where non-exempt employees do nothing but telephone sales. (*Id.* at 2 n. 2.)

The parties devote considerable attention in their briefs to interpreting the so-called "outside sales" exemption. The FLSA provides that "any employee employed ... in the capacity of outside salesman" is exempt from the Act's minimum wage, overtime, and timekeeping requirements. 29 U.S.C. § 213(a). ACS argues that to be an "outside salesman" for purposes of this exemption, an employee need only perform outside sales "greater than occasional[ly]," even less than once a week is enough, so long as sales work, in whatever form, is the employee's "primary duty." (Def.'s Resp., D.E. 25 at 6, 9.) The plaintiffs, on the other hand, maintain that the exemption requires an employee's primary duty to be the performance of not just any sales, but specifically *outside* sales. (Pls.' Reply, D.E. 34 at 8.) ACS contends that the meaning of "outside salesman" is relevant at this stage to determine whether the plaintiffs have proved ACS had a "single, FLSA-violating policy." According to ACS, if any members of the proposed class were actually exempt from the FLSA, then it cannot be said that there was an "FLSA-violating policy" as to which the plaintiffs were similarly situated. ACS submits that, here, there is no "FLSA-violating policy" because even the named plaintiffs met the requirements of the outside-sales exemption as that exemption has been explained in the regulations and interpreted by the courts.

**\*6** Essentially, ACS asks the court to not only interpret the exemption, but also to *apply* the requirements of the exemption to the named plaintiffs, the putative opt-in plaintiffs, or perhaps both. To do so, however, would be to decide the ultimate substantive issue in this case, and the weight of authority commands that, at this first stage of certification, "a court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated." *Davis v. Charoen Pokphand (USA), Inc.,* 303 F.Supp.2d 1272, 1277 n. 6 (M.D.Ala.2004); *accord Burdine v. Covidien, Inc.,* No. 1:10–CV–194, 2011 WL 2976929, at \*4 (E.D. Tenn. June 22, 2011) (declining to consider the merits at the conditional certification stage and concluding that the "better approach" is to "ask[ ] only whether the named Plaintiffs are similarly situated to the potential plaintiffs"); *Heldman v. King Pharms., Inc.,* No. 3–10–1001, 2011 WL 465764, at \*3 (M.D.Tenn. Feb. 2, 2011)(noting that by arguing at the "first stage" that the plaintiff was exempt from the FLSA, the defendant was "moving prematurely to the merits of [the] action"); *Brasfield v. Source Broadband*

*Servs., LLC,* 257 F.R.D. 641, 642 (W.D.Tenn.2009) ("At this [first] stage the Court does not ... decide substantive issues going to the ultimate merits...."); *Ruggles v. WellPoint, Inc.,* 591 F.Supp.2d 150, 158 (N.D.N.Y.2008)(stating that weighing the merits before conditional certification "would invariably defeat the ... statutory intent to facilitate a broad remedial purpose"); *see Hoffmann–La Roche v. Sperling,* 493 U.S. 165, 174 (1989)("In exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality. To that end, courts must take care to avoid even the appearance of judicial endorsement of the merits of the action."). *But cf. Olivio v. GMAC Mortg. Co.,* 374 F.Supp.2d 545, 551 (E.D.Mich.2004)(concluding that the plaintiff-loan-officers could not prove they were similarly situated to the potential plaintiffs—other loan officers—because the outside-sales exemption applied, generally, to all of the defendant's loan officers).

It is necessary, however, in this case for the court to determine the proper interpretation of the outside-sales exemption in order to decide whether the employees to be notified are similarly situated to the named plaintiffs. As explained above, the term "similarly situated" in this context has not yet been concretely defined. It is not the case, however, as ACS contends, that the plaintiffs "*must* allege that a single, FLSA-violating policy proves a violation as to all the plaintiffs" in order to show they are similarly situated. (D.E. 25 at 7 (emphasis added)(internal quotation marks omitted).) What is important is that the plaintiffs are "similarly situated" to the potential opt-in plaintiffs "with respect to whether a[n] FLSA violation has occurred," *Myers v. Hertz Corp.,* 624 F.3d 537, 555 (2d Cir.2010), regardless of whether the defendant-employer accomplished that alleged violation through implementation of a policy or otherwise. The Sixth Circuit in *O'Brien v. Ed Donnelly Enters.,* 575 F.3d 567 (6th Cir.2009) explained that proof of a single violating policy is but *one* way to establish that putative class members are similarly situated; the court made absolutely clear that "[s]howing a 'unified policy' of violations is not *required.*" *Id.* at 584–85 (emphasis added). Indeed, the *O'Brien* court granted certification despite the lack of a single FLSA-violating policy, finding that the plaintiffs in that case were nonetheless similarly situated because "their claims were unified by common theories of defendants' statutory violations, even if the proofs of these theories [were] inevitably individualized and distinct." *Id.* at 585.

**\*7** Here, the named plaintiffs' challenge to ACS's compensation formula, which applies to all MSRs and which effectively denies overtime and fails to guarantee minimum wages, and/or to ACS's wholesale treatment of MSRs as "outside salesman" exempt from FLSA requirements, could arguably be interpreted as alleging the existence of a single FLSA-violating policy applicable to, and suffered by, the entire proposed class. Yet, the named plaintiffs themselves acknowledge that "some MSRs may [properly] be treated as outside salespeople." (Pls.' Reply, D.E. 34 at 3.) Thus, because neither of these policies is, on its face, violative of the FLSA and because the named plaintiffs themselves acknowledge some MSRs are properly treated as outside salespeople the plaintiffs' position is more appropriately construed as alleging that they share with the potential opt-in plaintiffs "common theories of [ACS's] statutory violations." Thus, the court must assess whether in fact the plaintiffs have shown that such a theory unites the proposed class.

The named plaintiffs have made clear their theory of ACS's FLSA violations: that ACS misclassified them as "outside salesman" exempt from the FLSA even though the majority of their working time was spent doing telephonic sales, which are inside sales. The question then is whether the named plaintiffs have made a sufficient showing that the potential opt-in plaintiffs are theoretically sitting on claims against ACS which are based on that same theory. It is not enough for the named plaintiffs to assert that ACS "applied a similar classification to

all of them." *Killion v. KeHE Distributors,* No. 3:12 CV 470, 2012 WL 5385190 (N.D.Ohio Oct. 31, 2012). Instead, there must be a specific factual showing, albeit "modest," that the theoretical claims of the potential class members share with the named plaintiffs a common theory that the "outside salesman" classification was improperly applied to them.

The implementing Labor Department regulations define an "outside salesman" within the context of the 29 U.S.C. § 213(a)(1) exemption as

[A]ny employee:

  (1) Whose primary duty is:

    (i) making sales within the meaning of section 3(k) of the Act, or

    (ii) obtaining orders or contracts for services or for the use of facilities ...; and

  (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a)(2011). Section 3(k) of the Act defines "sale" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). The court finds untenable the position of the plaintiffs that the "primary duty" required in Paragraph (1) must be outside sales, as opposed to sales in a general sense. The plain language of the paragraph unequivocally suggests otherwise—that the primary duty must be "sales," which term is defined broadly in the referenced section of the Act. There is absolutely no indication that the definition of sales was intended to be limited in any way. The court has reviewed the cases cited by the plaintiffs on this matter and finds nothing therein to suggest that "sales" within the context of Subparagraph (i) means anything other than what it says it means. Rather, the *outside* quality of the sales comes up in Paragraph (2). The regulations define "customarily and regularly" as "a frequency that must be greater than oc-

casional but which, of course, may be less than constant ... [;] it does not include isolated one-time tasks." 29 C.F.R. § 541.701. The Department of Labor has issued an opinion letter expressing its position that "[n]othing in [29 C.F.R. § 541.701] requires that, to meet the definition of 'customarily and regularly,' a task be performed more than once a week or that a task be performed each and every workweek." Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, 2007 WL 506575 (Jan. 25, 2007)(alterations in original)(internal quotation marks omitted).

**\*8** It is undisputed that sales, generally, was the primary duty of all MSRs. Thus, the named plaintiffs' theory that ACS violated the FLSA necessarily relies on their not having "customarily and regularly" conducted outside sales. The plaintiffs, however, simply have not shown sufficient similarity to *all* MSRs with respect to that theory. Nowhere in the named plaintiffs' declarations do they attest that ACS instructed them (individually), much less every MSR, that they were required to perform their sales work at any particular place or in any particular manner. Rather, Sachse states very clearly in his declaration: "Membership Salespeople could work at the office or at home. So long as the Membership Salesperson was recording enough sales, ACS did not care how the sales were obtained." (Sachse Decl. ¶ 10.) The only evidence the plaintiffs have presented as to the sales activities of the individuals to whom it seeks to send notice (all MSRs in the relevant three-year period) is the following vague, conclusory statement of Sachse: "In my conversations with other sales managers and sales representatives, I think my experience and observations are common ... [that] MSRs spent the vast majority of their time on working the ACS-provided phone." (*Id.* ¶ 16.) That alone does not amount even to a "modest" factual showing that the proposed class, universally, is similarly situated with respect to the circumstances that the plaintiffs purport unite the class.

Although, ordinarily, "disparate factual and

employment settings of the individual plaintiffs' should be considered at the second stage of the analysis," rather than the first, *White v. MPW Indus. Servs., Inc.,* 236 F.R.D. 363, 373 (E.D.Tenn.2006) (internal quotation marks omitted), here, variances between sales methods and time allocations among MSRs suggest not just the likelihood that the case will require individualized proof, but also that the potential class members are in fact not similarly situated to one another with respect to their status under the FLSA, and thus to "whether a[n] FLSA violation has occurred." *Cf. Bowman v. Crossmark, Inc.,* No. 3:09–CV–16, 2010 WL 2837519, at *6 (E.D.Tenn. July 19, 2010)(denying conditional certification based in part on the fact that "[t]he evidence in the record does not support plaintiffs' contention that retail representatives nationwide perform their [ ] duties exactly as they do and that they are required to perform the tasks as they do"); *Matthews v. ALC Partner, Inc.,* No. 2:08–CV–10636, 2009 WL 2591497, at *5 (E.D.Mich.Aug.24, 2009) ("[D]ue to the varying job duties of Managers and Assistant Managers, both of which will be relevant to the propriety of their managerial classifications, the Court concludes that even these two groups of employees cannot be included in a single class."); *Evancho v. Sanofi–Aventis U.S. Inc.,* No. 07–2266, 2007 WL 4546100, at *4 (D.N.J. Dec. 19, 2007) ("While the Court need not reach the merits [of the exemption arguments], these differences between various PRs' descriptions of their job responsibilities and duties show that status under the FLSA may vary among plaintiffs and potential collective action members.").

**\*9** In sum, the plaintiffs have not shown that members of the proposed class are similarly situated with respect to the circumstances rendering (or not) ACS's failure to pay them minimum wage and/or overtime violative of the FLSA. It would therefore be inappropriate to conditionally certify the proposed class a collective action pursuant to Section 216(b).

Accordingly, the plaintiffs' motion for conditional certification is denied, and the court will not facilitate notice to members of the proposed class.

IT IS SO ORDERED.

W.D.Tenn.,2013.
Bearden v. AAA Auto Club South, Inc.
Not Reported in F.Supp.2d, 2013 WL 1181474 (W.D.Tenn.)

END OF DOCUMENT