# EXHIBIT 25



Not Reported in F.Supp.2d, 2006 WL 572337 (M.D.Tenn.)
**(Cite as: 2006 WL 572337 (M.D.Tenn.))**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Tennessee, Nashville Division.
Troy PEEBLES, Craig E. White, Bryan Kloutse, Melvin Motley, Jr., Leon Felder, Cecil Payne, Tonia Holford, Terry Harden, Gregory Miller, Gerald Davis, Sr., Courtney Thompson, Sr., Benjamin Robinson, Jr., Plaintiffs,
v.
A. SCHULMAN INC., Defendant.

No. 3:04-0754.
March 7, 2006.

Adam O. Knight, Martin D. Holmes, Stewart, Estes & Donnell, Nashville, TN, for Plainitiffs.

Charles H. Williamson, Robert Earl Boston, Waller, Lansden, Dortch & Davis, Nashville, TN, Sallie C. Lux, Brouse Mcdowell, Akron, OH, for Defendant.

*MEMORANDUM*
ECHOLS, J.

**\*1** Pending before the Court is Defendant's "Motion for Summary Judgment" (Docket Entry No. 70) to which Plaintiffs have responded in opposition (Docket Entry No. 83) and Defendant has replied (Docket Entry No. 89). Also before the Court is Defendant's "Motion to Strike Affidavit of Melvin Motley, Jr.," (Docket Entry No. 91) to which Plaintiffs have responded in opposition (Docket Entry No. 97). Finally, Defendant has filed a "Renewed Motion to Sever Plaintiffs' Claims, or, in the Alternative, to Order Separate Trials" (Docket Entry No. 94) to which the Plaintiff has responded in opposition (Docket Entry No. 98).

I. *FACTUAL BACKGROUND*

This an action which alleges claims of racial discrimination in employment. Originally twelve Plaintiffs brought this suit as a putative class action. However, all claims have been dismissed, except those brought by Plaintiff Troy Peebles ("Peebles") and Benjamin Robinson Jr. ("Robinson"). (Docket Entry No. 80, fn. 1).

Plaintiffs Peebles and Robinson, both of whom are African-American, claim that they were treated differently and subjected to harassment on the basis of their race in violation of Title VII, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981 (Counts I & II). They also bring the same claims under the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* (Count III). (Docket Entry No. 1).

Both Peebles and Robinson are presently employed by Defendant A. Schulman, Inc. ("Schulman" or the "company") at its facility in Nashville, Tennessee. Schulman is a supplier of high-performance plastics and resins. It has four manufacturing plants in the United States, one of which is located in Nashville. (*Id.* ¶¶ 26-27).

Although Peebles and Robinson bring similar claims, the facts underlying their complaints are different. Accordingly, those facts (which have been presented to the Court in a very disjointed fashion) will be considered under separate subheadings after a review of the general employment policies in effect at the Nashville plant.

A. *General Employment Policies of Defendant*

Schulman has a policy to prevent and correct workplace harassment and discrimination which is given to all of its employees, including those at the Nashville Plant. (Def SOF 2).[FN1] Both Peebles and Robinson were aware of the policy and further knew that there were several ways to report harassment. (Def. SOF ¶¶ 2, 26).

> FN1. In accordance with Local Rule 8(b), the Defendant provided the Court with a Statement of Undisputed Material Facts to which the Plaintiffs have responded. Where a fact is undisputed, citation is made to the paragraph containing that fact,

e.g. "Def. SOF ¶ 1." Otherwise, citation is made to the underlying record.

Pursuant to the attendance policy, there are three stages of written warnings given to employees who miss work. An employee who accumulates eight points is subject to termination. (Def. SOF ¶ 14).

Schulman had a written policy relating to leaving work for emergency room treatment. Under the policy, employees are excused from work to receive emergency room treatment if they have (1) severe cuts, including profuse bleeding that may need sutures; (2) second or third degree burns; (3) broken bones; or (4) are unconsciousness. (Def. SOF ¶ 20).

B. *Plaintiff Peebles' Allegations*

***2** Peebles was hired by Schulman as a single screw machine operator at its facility in Nashville, Tennessee (the "Nashville Plant") in 1996. He remains employed as a production employee at the Nashville facility. (Def SOF ¶ 1).

Production employees at Schulman are issued Tyvek suits which are white coveralls used to protect workers from being covered with plastic dust and debris. (Dillard Aff. ¶ 5). Peebles claims that he heard from other employees that, in May 2003, co-worker Rodney Bellamy used a sleeve from his Tyvek suit to cover his head. Peebles was not present for, and did not witness, the incident. (Def SOF ¶ 3). One of Peebles' co-workers who actually witnessed the incident complained to a supervisor who immediately went to Bellamy and instructed him to remove the sleeve from his head, which Bellamy did. (Def SOF ¶ 4). After an investigation, Bellamy was warned about his potentially harassing conduct. (Dillard Aff. at ¶ 7). No further complaints were made about any such conduct by Bellamy. (*Id.*).

Peebles claims that at some point prior to 2002, he heard from other employees that a co-worker, Ronnie Day, who worked on a different shift, had used a racial slur. Peebles himself was not present and did not hear Day use a racial slur. (Def. SOF ¶ 5). When Peebles heard from co-workers that Day had used a racial slur, he and two white supervisors informed the plant superintendent about Day's alleged behavior. (Def. SOF ¶ 6). The plant superintendent assured Peebles and the supervisors that the matter would be addressed and, after that meeting, Day's behavior was corrected and Peebles never again heard of Day using racist language. (Def. SOF ¶ 7).

Peebles claims that his former supervisor, Larry Williams ("Williams") (who is, like Peebles, an African-American) harassed him by speeding up his production line. (Def. SOF ¶ 8). It was part of Williams' job to make sure that Peebles' and other employees' production lines were running at the appropriate speed and, if an employee was not meeting production, to speed up his or her machine. (Def. SOF ¶ 9). Nevertheless, Peebles contends that Williams allowed white employees to run their lines slower than production needed and that such employees did so with impunity. (Peebles Depo. at 41-43). Peebles has no evidence that the treatment he received as compared with co-workers who allegedly ran their machines slower was based on race. In fact, Peebles testified in his deposition that after Williams would speed up the line he would come into the break room and say "your line is f**ked up" and hence Peebles concedes it could have been an attempt at a joke on Williams' part. (Peebles Depo. at 42).

Peebles alleges he was harassed when he was once issued a non-disciplinary note-to-file. The note was placed in Peebles' file when Peebles allegedly failed to pick up sample bags from the laboratory as requested by his supervisor, Raymond Simpson ("Simpson"). Picking up sample bags is a part of every production line operator's job. (Def. SOF ¶ 11). After Peebles told Simpson he had in fact complied with the request to pick up the sample bags, the note was removed from Peebles' personnel file. (Def. SOF ¶ 12).

***3** Peebles was terminated on September 29,

2003 for violating Schulman's attendance policy. (Def. SOF ¶ 13). Peebles was scheduled to work the weekend of September 20-21, 2003, but called in sick. (Peebles Depo. at 101-102). Although Peebles does not recall it, Defendant claims this was a mandatory overtime shift and that several employees did not report as scheduled. (*Id.*). As a result of his absence that weekend, Peebles received two attendance points under the attendance policy which placed him over the allowable number of attendance points. (*Id.* at 103; Dillard Aff. ¶¶ 16, 19).

Peebles filed a grievance pursuant to the Collective Bargaining Agreement ("CBA") between Schulman and the Teamsters, Chauffeurs, Helpers and Taxicab Drivers, Local Union No. 327 (the "Union"). Schulman decided not to settle the grievance at that time. (Dillard Aff. ¶ 20).

At around this same time, Schulman became aware that its attendance policy was not being uniformly enforced, because former Plant Manager Bill Hilgerson ("Hilgerson") generally reversed terminations based upon attendance issues, particularly if the Union decided to pursue the matter. (Carpenter Aff. ¶ 7). The lack in uniformity affected both minority and non-minority workers. For example, Solomon Okoli and Cecil Payne, both African Americans, were not terminated when their number of points exceeded the allowable 8.0 points and, at least one other African American, Albert Farrell, remained employed even after he had more than double the number of allowable points. (Dillard Aff. ¶¶ 21-24).

An outside investigation regarding the application of the attendance policy was performed at Schulman's request. The investigation revealed that the attendance policy had not been uniformly enforced but the non-uniform application was not racially based.[FN2] (Dillard Aff. ¶ 22; Carpenter Aff. ¶ 7).

> FN2. Plaintiffs present no evidence to dispute Defendant's contention that the non-uniform application of the policy affected minority and non-minority workers alike. In fact, in response to Defendant's Statement of Facts, Plaintiffs assert "that the 'decision to rewrite its entire disciplinary policy' was based on the independent investigation which indicated that the application of the policy was nonuniform amongst its employees." (Pfs. Resp. to Def. SOF ¶ 18).

In November 2003, the company rewrote its entire disciplinary policy, including its attendance policy. That change was communicated to all employees through a series of meetings held during the week of November 10, 2003. (Def. SOF ¶ 17). With the implementation of the new attendance policy, all employees' attendance points which had been accumulated between August 20, 2003 (when former Plant Manager Hillgerson left) and the date the new attendance policy was implemented were removed from the employees' records. (Def. SOF ¶ 18).

As a result of the forgiveness in points, Peebles only had 6.5 attendance points, which was below the 8.0 point level that mandated termination. Peebles was therefore reinstated to his job on November 16, 2003, with full back pay and benefits, healthcare, pension and seniority. (Def. SOF ¶ 19).

Apart from the foregoing, Peebles makes several other allegations about alleged discriminatory treatment or conduct. He claims he was discriminated against when he was placed on light duty because he was required to work while other employees on light duty were allowed to sit in the break room. He also alleges that he was discriminated against when he was not allowed to go to the emergency room after he strained or sprained his ankle. In addition, Peebles generally claims African American employees were watched more closely than whites and were required to take specified break times while whites were not. Finally, Peebles claims that third shift employees did not receive pizza when other shift employees did, and that third

shift employees had to clean up the messes made by the second shift.

C. *Plaintiff Robinson's Allegations*

***4** The bulk of Robinson's allegations have to do with his contention that he was not promoted because of his race. He also claims he was harassed on one occasion.

Robinson began working for Schulman's predecessor in October 1992 as a machine operator, a position he held for approximately two years. In approximately 1994, Robinson applied for, and received, an hourly position in the laboratory as an "In Process Laboratory Technician."

Robinson's first supervisor in the lab was Victor Johns ("Johns"). Johns, a white male, left Schulman in 2000. Parviz Baghaii ("Baghaii"), a middle-eastern male, replaced Johns as Robinson's supervisor in the laboratory. (Def. SOF ¶¶ 22-23).

In 2001, Robinson successfully applied for a Material Handler position. Robinson remained in the Material Handler position until that position was eliminated due to a reduction in force in August 2003. Because of his seniority, Robinson was not laid off during this reduction in force but instead was transferred to a position in Master Batch.

Robinson believes that rather than being transferred to Master Batch, he should have been permitted to move back into the laboratory (which he voluntarily left in 2001), and "bump" Laboratory Technician Teresa Jones ("Jones") into the Master Batch position. (Def. SOF ¶ 51). However, the CBA provides that employees with seniority are given shift preference (and can therefore bump employees with less seniority) only if the employees are in the same job classification. (Dillard Aff. at ¶¶ 58-59). In August 2003, Robinson was a Material Handler, a job classification completely different from Jones' job classification as a Laboratory Technician. (*Id.*). Under the CBA, Robinson could have grieved his not receiving a position in the lab, but he chose not to do so. (Robinson Depo. at 115-116).

The Material Handler position was resurrected a few months later. Robinson was reassigned back to that position. (Def. SOF ¶ 24).

In order to work as a lab technician of any kind for Schulman, an employee must be certified. Because Robinson had transferred out of his laboratory position in 2001, and because there were subsequent upgrades and changes in equipment used in the laboratory, his lab certification expired. (Def. SOF ¶ 45).

In early 2003, Robinson wanted to renew his lab certification and went to the plant when he was not scheduled to work to update his lab certification training. (Def. SOF ¶ 46). Initially, Schulman did not want Robinson to train when he was not scheduled to work as it would be responsible for paying overtime. Schulman however decided to permit Robinson to come in two or three days per week at times he was not scheduled to work in his regular job to update his lab certification training. Robinson did so for several months and received overtime payments for his training time. (Def. SOF ¶ 47).[FN3] In the spring of 2004, Robinson bid back into the laboratory pursuant to the CBA as an In Process Lab Technician. (Def. SOF ¶¶ 25, 48).

> FN3. During April or May 2003, Robinson stopped his lab certification training for a brief period of time. No one at Schulman ever instructed Robinson to stop training, and, in fact, when Robinson subsequently spoke with supervisor Baghaii about resuming his lab training, Baghaii gave approval and took steps to help Robinson to continue his lab training. (Robinson Depo. at 131-133).

**ature5** In December 2004, Robinson applied for, and was promoted to, the position of "Certification Lab Technician," a salaried position. Robinson is still employed by Schulman in that position. (Def. SOF ¶ 25).

Case 3:14-cv-02184 Document 93-25 Filed 07/06/15 Page 5 of 19 PageID #: 1270

Robinson believes that based on the number of years he worked for Schulman (and its predecessor), he should have been promoted to a Certification Lab Technician position years before he actually received the promotion. (Def. SOF ¶ 31). However, the position of Certification Lab Technician is not awarded on the basis of seniority. A Certification Lab Technician position has a different and more advanced training matrix and qualifications than the position of In Process Laboratory Technician. (Def. SOF ¶ 32).

Additionally, Robinson claims that he was subjected to discrimination because Dick Spurlock ("Spurlock"), a white male, was promoted to a Certified Lab Technician position before him, even though Robinson trained him in the "end process lab position" and even though Robinson had worked at Schulman longer. (Robinson Aff. ¶¶ 10). He also claims discrimination because Clarence Johnson ("Johnson"), an African American male, was promoted before him to a Certified Lab Technician position. (*Id.*). However, both Spurlock and Johnson had many more years of laboratory experience than Johnson. (Kathy Peck Aff. ¶¶ 3, 6, 7, 8, 13 & Ex. 3).

At the time that the Certification Lab Technician position became available, Robinson was performing most of the duties that were required for the position. Robinson claims when the position became open, he was not notified of its availability, nor was the position posted. (Robinson Aff. ¶ 8, 9, 20). Because of that, Robinson never submitted a written application, but instead verbally informed Baghaii of his interest. (Robinson Depo. at 89). Nevertheless, Robinson concedes that the Nashville plant is a small facility and that when positions become open the employees generally know of the opening. (Robinson Depo. at 58-59).

As for Baghaii's motivation, Robinson believes that Baghaii did not promote him to the Certified Lab Technician position because Baghaii is from the Middle-East and because Robinson served in Desert Storm. (Robinson Depo. at 23-25).

Occasionally, production supervisor positions become available and all employees, including Robinson, are aware of the openings and that they can apply for the positions. (Def. SOF ¶ 36). Robinson claims he "made it clear" through verbal communications that he would be interested in a supervisor position if one became available. (Robinson Depo. at 52-54). At the time Robinson expressed interest in becoming a production supervisor, Robinson had only two years production experience from the early 1990's (which was before Schulman even owned the Nashville plant) and had no supervisory experience at all. (Def. SOF ¶ 38).

Defendant claims Schulman does not promote individuals to supervisory positions based upon seniority, but instead bases such promotions upon a showing of interest and qualifications for the position. (Dillard Aff. ¶ 42). Robinson claims that the openings are filled based on the "buddy system" and that "cohorts or friends" of management receive the positions. (Robinson Aff. ¶¶ 14, 15).

**\*6** On two different occasions, Robinson applied for a Maintenance Tech position, but did not receive either of those positions. (Def. SOF ¶ 40). The Maintenance Tech position requires mechanical and electrical skills. To demonstrate these skills, and thus demonstrate qualification for the position, an applicant is required to receive at least sixty (60) points on a test that was created and is administered by Nashville Tech. (Def. SOF ¶ 41).

The testing procedure was implemented after notice to, and input from, the Union. (Robinson Depo. at 73-75; Dillard Aff. ¶ 45-47). Robinson claims that the changes in the testing procedure occurred at about the time he expressed interest in a Maintenance Technician position and that the policy was merely "revised" by Nashville Tech. (Robinson Aff. ¶¶ 16, 17).

Every employee wishing to take the test for the Maintenance Tech position was provided the same opportunity and resources to prepare for the test. All interested employees, such as Robinson, were

Not Reported in F.Supp.2d, 2006 WL 572337 (M.D.Tenn.)
**(Cite as: 2006 WL 572337 (M.D.Tenn.))**

given a study guide as well as the name of a contact person at Nashville Tech as resources to prepare for the test. Nothing prevented Robinson from taking classes to prepare for the test. (Def. SOF ¶ 43).

On two separate occasions, Robinson attempted to pass the maintenance test. On both occasions, he failed. (Def. SOF ¶ 44).

Apart from the foregoing claims regarding the denial of promotions, Robinson also alleges he was improperly assessed points on his attendance record for snow days whereas a white employee, Tom Hamilton, was not assessed any points for taking time off due to snow. (Robinson Depo. at 140). Under certain unusual circumstances, Schulman forgives points on an employee's attendance record. This occurs, for example, if there is extreme snow or treacherous road conditions. (Def. SOF ¶ 54).

On January 16, 2003, Nashville, Tennessee, received an unusual amount of snow. In fact, so much snow fell in such a short period of time that Schulman declared an emergency and notified the Union that because so many employees could not make it to work, Schulman would use management personnel to keep the production lines running. Numerous employees, minority and non-minority, were absent from, or tardy to, work that day. Those employees, including Tom Hamilton ("Hamilton"), a white male, did not receive points on their attendance records. (Def. SOF ¶¶ 54-58; Robinson Depo. at 150-152).

Robinson received a point for missing work on February 26, 2002, which he claims was due to being unable to drive because of the snow which was falling on his way in to work. (Robinson Depo. at 151). Robinson claims his situation was similar to that of Hamilton on January 16, 2003. However, Schulman had not declared a "snow day" for February 26, 2002. (Def. SOF ¶ 59).

Robinson's sole claim of racial harassment relates to an event which occurred in July 2002, when he was working as a Material Handler. Robinson alleges that a white co-worker named Larry Hodges ("Hodges") harassed him by waving a wrench and shouting at him "it's on you," implying that Robinson was responsible for making the repairs Hodges had been called to fix. (Def. SOF ¶ 27). Robinson reported the incident to his supervisor Phil Jackson ("Jackson") and requested that Jackson contact Robinson's supervisor, Alan Ryan ("Ryan"), to confirm that it was Hodges' duty to perform the repairs, not Robinson's. Jackson contacted Ryan per Robinson's request and Ryan confirmed that it was Hodges', and not Robinson's, duty to perform the repairs. (Def. SOF ¶ 28). After that encounter, Hodges never raised his voice or threatened Robinson again. (Def. SOF ¶ 29). Robinson testified in his deposition that he did not believe the incident with Hodges was race-related (Def. SOF ¶ 30; Hodges Depo. at 85).[FN4]

> [FN4]. In an affidavit filed in opposition to Defendant's Motion for Summary Judgment, Robinson notes that Hodges was related to the President of the Teamsters Local 327 and felt that perhaps the relationship between Hodges and the union president was the reason Shulman did not pursue the matter any further. Even though Robinson was a member of the bargaining unit, he did not press the matter since he was afraid he might lose his job. (Robinson Aff. ¶ 6-7). Even in his affidavit, however, Robinson does not suggest the incident with Hodges was motivated by some sort of racial animus.

## II. *APPLICATION OF LAW*

**\*7** Defendant has moved for summary judgment on all of Plaintiff Peebles' and Robinson's claims. It has also moved to strike the Affidavit of Melvin Motley, Jr. ("Motley") which Plaintiffs filed in opposition to the motion for summary judgment.

A. *Motion to Strike*
Defendant moves to strike Motley's Affidavit on the grounds that several of its paragraphs con-

Not Reported in F.Supp.2d, 2006 WL 572337 (M.D.Tenn.)
**(Cite as: 2006 WL 572337 (M.D.Tenn.))**

tain legal conclusions about which Motley is not competent to testify while many other paragraphs must be stricken because they are not based upon personal knowledge. (Docket Entry No. 92 at 2). With regard to the contention that many of the paragraphs contain legal conclusions, Plaintiffs assert that because this is a racial discrimination case "[c]ertainly ... witnesses ... are competent to testify as to the action and practices of the defendant." (Docket Entry No. 97 at 1). As for the challenge to Motley's personal knowledge, Plaintiffs essentially assert that since Motley states the Affidavit is "based on Affiant's first hand knowledge," (Motley Aff. ¶ 1), this is sufficient.

An affidavit that does not satisfy the requirements of Rule 56(e) is subject to a motion to strike. So far as relevant, that Rule provides:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed.R.Civ.P. 56(e). Hence, "[a]ll affidavits, regardless of the author, must be made on personal knowledge and set forth facts that would be admissible in evidence." *Brainard v. American Skandia Life Assur. Corp.,* 432 F.3d 655, 667 (6th Cir.2005). In other words, the affidavits "must concern facts as opposed to conclusions, assumptions, or surmise." *Perez v. Volvo Car Corp.,* 247 F.3d 303, 316 (1st Cir.2001) (citing *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.1999)). "While the line between facts and non-facts often seems blurry, courts nonetheless must strive to plot it." *Id.* "It is the burden of the party submitting the affidavit to show circumstances indicating the witness has based the statement on personal knowledge." *Long v. Procter & Gamble Mfg. Co.* 2005 WL 1631033 at *1 (W.D.Tenn.2005).

In this case, Plaintiffs have submitted the Affidavit of Motley who worked for an unspecified period of time in an unidentified job at Schulman. Much of the Affidavit contains legal conclusions:

(1) "Schulman ... either directly engaged in discriminatory practices based upon race or permitted discriminatory acts premised on race to occur" (Motley Aff. ¶ 2);

(2) "Bill Hilgerson, a white male, discriminated against black employees ..." (*id.* ¶ 6);

(3) "Schulman has been engaged in disparate treatment with respect to discipline as to blacks and whites" (*id.* ¶ 9); and

(4) "similarly situated black employees" were made to work while injured (*id.* ¶ 12); and "the hostile work environment was so pervasive" (*id.* ¶ 17).

**\*8** Other paragraphs contain nothing more than conclusions or surmise and contain no suggestion as to the basis for personal knowledge:

(1) "the policy was not consistently applied across the board to all employees" (*id.* ¶ 5);

(2) Hilgerson "discriminated ... [in] not allowing similarly situated black employees similar points" (*id.* ¶ 6);

(3) "Troy Peebles was terminated for an accumulation of points ... when several points attributed to him were improperly placed on his total points" (*id.* ¶ 8);

(4) "Schulman instructed its supervisors to more closely watch its employees while on break and in the break room" while "similarly situated white employees were not so closely watched" (*id.* ¶¶ 10-11);

(5) "Schulman allowed various racial slurs, racial epithets, and other racist behavior to occur either by its plant manager, supervisors or other hourly employees so as to create a hostile work environment" (*id.* ¶ 15); and

(6) "Black employees who complained about these racist and hostile acts where [sic] treated even

more severely by the supervisors and the plant manager" (*id.* ¶ 16).

Such statements and unsupported conclusions are not competent evidence in the context of summary judgment. *See, Holman v. Revere Elec. Supply Co.,* 154 Fed. Appx. 501, 503 (7th Cir.2005) (affidavits stating "that there was 'harassment' and 'disparate treatment'-are conclusory' "); *Haley v. General Elec. Co.,* 3 Fed. Appx. 240, 248 (6th Cir.2001)("Without more, mere opinions expressed by co-workers who have no direct involvement in the decision-making processes have no probative value as to [defendants'] alleged discriminatory intent").

Apart from the conclusory statement that the Affidavit is based upon "firsthand knowledge," there is nothing which would suggest how Motley obtained the knowledge purportedly underlying his Affidavit. In fact, there is no indication as to what position Motley held, where he was when the supposed statements or decisions were made, or how he arrived at the broad statements of Schulman's intent and practice he sets forth in the Affidavit.

Paragraphs which contain nothing more than legal conclusions and speculation without factual support will be stricken in accordance with the dictates of Rule 56(e). The Court will strike paragraphs 2, 6, 9, 10, 11, 15 and 16. FN5

> FN5. The Court notes that even if Motley's Affidavit was considered in its entirety, this would not change the Court's conclusion that Schulman is entitled to summary judgment since such a motion is not precluded by the assertion of conclusory statements, *Maki v. Laakko,* 88 F.3d 361, 364 (6th Cir.1996), and Motley's Affidavit is nothing if not conclusory.

B. *Motion for Summary Judgment*

Plaintiffs Peebles and Robinson bring their claims under Title VII, the THRA, and 42 U.S.C. § 1981. The same basic analytical framework is used in evaluating claims under all three statutes. *See, Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 720 (6th Cir.2004)("[t]he elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981)"; *Gee-Thomas v. Cingular Wireless,* 324 F.Supp.2d 875, 881 (M.D.Tenn.2004) ("analysis of claims under the THRA is the same as under Title VII "). The substance of those claims will be considered after a review of the standards governing summary judgment and the applicable limitations periods.

1. *Standard of Review*

**\*9** A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Covington v. Knox County School Sys.,* 205 F.3d 912, 914 (6th Cir.2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley,* 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Covington,* 205 F.3d at 914 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed.R.Civ.P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson,* 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. *Applicable Limitations*

Plaintiffs bring their claims under three statutes, each of which has a different statute of limitations. Under Title VII, in a deferral state such as Tennessee, a claimant must file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within three hundred days of a discrete act of discrimination. *Tartt v. City of Clarksville,* 149 Fed. Appx. 456, 460 (6th Cir.2005).[FN6] While the three-hundred day limitation period does not apply to claims of a continuing nature (such as harassment), it does apply to discrete acts such as termination, failure to promote, denial of transfer or refusal to hire. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

> FN6. "While the 300-day bar is not jurisdictional, it does have the effect of a statute of limitations, and is not to be waived without good cause." *Id.*

In this case, Peebles filed his Charge of Discrimination on October 6, 2003, which means that his claims alleging discrete acts under Title VII extend back to December 11, 2002. Robinson filed his Charge of Discrimination on November 4, 2003, which means that his claims alleging discrete acts under Title VII extend back to January 8, 2003.

Claims brought under 42 U.S.C. § 1981 are subject to a four-year statute of limitations. *Jones v. R.R. Donnelley & Sons, Co.,* 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004). A claim under the THRA must be made within "one year after the alleged discriminatory practice ceases." T.C.A. § 4-21-311(d).

*10 Suit was filed in this Court on August 24, 2004. Hence, Plaintiffs' claims under Section 1981 are limited to those discriminatory acts which occurred after August 24, 2000, while their claims under the THRA are limited to those acts which occurred after August 24, 2003. Because, however, Plaintiffs bring their claims under all three statutes and Section 1981 provides the most generous statute of limitations, Plaintiffs' claims alleging discrete acts of discrimination are limited to those which occurred after August 24, 2000.

3. *Peebles' Claims*

In his brief in opposition to the motion for summary judgment, Peebles sets forth a litany of complaints, many of which involve alleged actions which happened to other employees. It is difficult to discern Peebles' specific allegations of discriminatory conduct because his factual allegations and legal arguments do not coalesce. For example, while his factual narrative contains a laundry list of allegations, his argument focuses mainly on two events. Nevertheless, the Court has scoured the record in an effort to discern the claims which at least marginally involved Peebles.

a. *Disparate Treatment Claims*

"Disparate treatment occurs when an employer treats some employees less favorably than others because of race[.]" *Hughley v. General Motors Corp.,* 52 F.3d 1364, 1370 (6th Cir.1995). "To base a claim on disparate treatment, the plaintiff must show discriminatory motive," *id.,* and this may be shown either through direct evidence or indirect evidence utilizing the burden shifting paradigm of *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Peebles presents no direct evidence of disparate treatment and hence he must show (1) membership in a protected class, (2) an adverse employment action, (3) qualification, and (4) dissimilar treatment to one similarly situated. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992).

Upon such a showing, a defendant may rebut the presumption of discrimination by proffering a

legitimate, nondiscriminatory reason for its decision, with the plaintiff then bearing the burden of showing that the defendant's proffered reason is pretextual. *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.*

Peebles claims he was treated differently on account of his race because he was terminated for receiving too many attendance points whereas whites who received the same or more points kept their jobs. Peebles also claims he was subjected to different treatment in relation to picking up sample bags. Peebles further claims he was discriminated against when he was placed on light duty and when he was not allowed to go to the emergency room. Finally, he claims African American employees were watched more closely than whites, were required to take specified break times while whites were not, that those on the third shift did not receive pizza while employees on the other shifts did, and that employees on the third shift had to clean up the messes made by the employees on the second shift.

i. *Attendance Points*

**\*11** Peebles claims he was discriminated against when he was terminated September 29, 2003, for accruing too many attendance points. However, Peebles cannot establish a *prima facie* case because he cannot show that dissimilar treatment was given to one outside the protected class.

Peebles compares his situation to that of Paul Biggs and Nola Medellin, both white employees who exceeded the number of allowable points but were allegedly treated better. (Docket Entry No. 86 at 23-24). However, those individuals are not proper comparators.

Even though "[e]xact correlation is not required," in order "[t]o be similarly situated, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Smith v. Leggett Wire Co.,* 220 F.3d 752, 762 (6th Cir.2000). Biggs and Medellin were not similarly situated to Peebles in that both grieved their terminations and Hilgerson capitulated and rescinded their terminations. While Peebles too grieved his dismissal, it was not settled at a grievance hearing because Carpenter, who replaced Hilgerson as Plant Manger, determined that Peebles had clearly violated the attendance policy. Further, unlike Peebles, Medellin presented documentation which indicated that she had valid medical reasons for some of her absences and that therefore points should not have been assessed for certain days.

Additionally, even if Biggs and Medellin are considered to be appropriate comparators, Plaintiff has not shown that he was treated differently because of his race. Quite the contrary, he too was reinstated after his termination and given full back pay, benefits, and seniority.

Even assuming Peebles can establish a *prima facie* case, Schulman has presented a legitimate non-discriminatory reason for its action and Plaintiff has not shown this to be pretextual. The stated reason for Peebles' termination was that he had amassed more than 8.0 attendance points and therefore was subject to termination. Peebles does not claim he did not have enough points to warrant termination under the policy, but instead claims that Schulman is lying as to its reasons for termination because other employees, who had amassed the same or more points, were allowed to remain employed.

The primary problem with this contention is that Peebles has presented absolutely no evidence that African Americans were treated any differently than whites in regard to whether their accumulation of more than eight points would lead to termination. Unquestionably, at least up until Carpenter's ar-

rival, the attendance policy was not being consistently applied. However, the inconsistent application occurred whether the employee was African American or white. At various times prior to Carpenter assuming the role of Plant Manager, African American employees remained employed even though they exceeded the 8.0 total, e.g. Solomon Okoli, Cecil Payne, and Albert Farrell. (Dillard Aff. ¶ 25). After it had been determined that the old policy had not been employed consistently, *all* employees' attendance points for the period between August 20, 2003, and November 10, 2003 were forgiven which meant that some employees, like Peebles, were able to come back to work even though they had unquestionably accumulated enough points to be terminated. (Carpenter Aff. ¶¶ 10 & 11).

***12** "The essence of a disparate treatment case is that the employer simply treats some people less favorably than others because of race[.]" *Brown v. Brentwood Music, Inc.,* 1998 WL 415832 at *1 (6th Cir.1998).[FN7] The Court finds Peebles has presented no evidence from which a jury could reasonably conclude that his termination occurred because of his race.

> FN7. The Court recognizes that in some circumstances, a facially neutral policy may affect one group more harshly than others, that is it has a disparate impact, and, that, in such cases, proof of discriminatory motive is unnecessary. *Intern. Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In this case, Plaintiffs offer no statistical evidence which would suggest that African American employees fared worse under the old attendance policy than did white employees. *See, Isabel v. City of Memphis,* 404 F.3d 404, 411 (6th Cir.2005)(second element of *prima facie* case of disparate impact is that "statistical analysis proves that the challenged practice has an adverse impact on a protected group").

ii. *Sample Bags*

All production line operators are required to pick up sample bags from the laboratory. On September 18, 2003, Peebles' supervisor was informed that Peebles failed to accomplish this task and Peebles was issued a "note to file" regarding his alleged failure to comply. In actuality, Peebles had picked up the sample bags and when he notified his supervisor of that fact, the note was removed from Peebles' personnel file. (Peebles Depo. at 98-100).

This claim fails for two separate reasons, both of which have to do with Peebles' inability to establish a *prima facie* case. First, Peebles cannot show that he suffered any sort of adverse action. Second, he can point to no one who was similarly situated yet treated differently.

Adverse action requires a showing of a material adverse change in the terms and conditions of employment which are more disruptive than a mere inconvenience and constitute such things as "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atlantic Co., Inc.,* 188 F.3d 652, 662 (6th Cir.1999) (citation omitted). A note to the file which is subsequently removed does not amount to an adverse action. *Handshoe v. Mercy Medical Center,* 34 Fed. Appx. 441, 446 (6th Cir.2002) (a "write-up" is "insufficient to rise to the level of a materially adverse employment action"); *Allen v. Michigan Dep't of Corrections,* 165 F.3d 405 (6th Cir.1999) (an employee's receipt of "counseling memoranda" disciplining him for specific rules infractions did not amount to materially adverse actions for purposes of the plaintiff's Title VII race discrimination claim); *Reid v. Madison County,* 1999 WL 196560 at *2 (6th Cir.1999) (reprimand did not constitute materially adverse action in Title VII retaliation claim where plaintiff did not suffer time off, suspension, loss of pay or benefits, or change in du-

ties).

Additionally, Peebles cannot establish the fourth element of a *prima facie case,* dissimilar treatment. Quite the contrary, Peebles conceded in his deposition that he was not treated any differently than anyone else in regard to this episode. (Peebles Depo. at 102). Accordingly, Schulman is entitled to summary judgment on this claim.

iii. *Light Duty and Medical Care*

Peebles claims he was subjected to discriminatory treatment in relation to events which occurred when he was placed on a medical restriction and when he was not allowed to go to the emergency room. Again, both claims fail because Peebles cannot establish a *prima facie* case.

**\*13** On January 31, 2002, Peebles was placed on a one-week 25-pound lifting restriction as a result of a back and shoulder injury. He claims that while under this restriction, he was required to continue work, whereas several white employees were allowed to sit in the break room and perform no work. His only basis for this contention is that he would see those employees when he took breaks and those employees told him they were not working.[FN8] Peebles makes no attempt to show that he was similarly situated to these employees by identifying where they worked, the nature of extent of their injury or medical condition, and who supervised them. One of those employees, Kevin Simpson, by Peebles' own admission, was not similar to him because Simpson had an open wound and was not allowed to be in an environment where he would be exposed to dust and dirt. (Peebles Depo. at 22).

> FN8. In his Affidavit, Motley claims that "some white employees who were on light-duty status were allowed to sit in the break room and work crossword puzzles" and that "Mike Smithson (white male) was allowed to sit in the break room and work crossword puzzles during an entire shift while on light duty." (Motley Aff. ¶¶ 11 & 12). These averments do not create a material issue of fact because absolutely no basis is given for Motley's ability to arrive at conclusion that Schulman "allowed" such conduct.

"In proving a circumstantial case, it is the plaintiff's burden to call to the Court's attention evidence that [the company] actors treated the plaintiff differently than similarly-situated employees outside the protected class." *Jamison v. Dow Chemical Co.,* 354 F.Supp.2d 715, 734 (E.D.Mich.2004) (citing *Johnson v. University of Cincinnati,* 215 F.3d 561, 572 (6th Cir.2000)). To establish this "similarity," the plaintiff is "required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998). Where, as here, a plaintiff is asserting that he was treated differently than those outside the protected class as a result of medical restrictions, it is incumbent upon the plaintiff to show the nature of the comparison employee's restrictions as well as the type of job those employees performed. *Jamison,* 354 F.Supp.2d at 735-736. Peebles makes no such effort in this case and, accordingly, Schulman is entitled to summary judgment on this claim.

Peebles also claims discriminatory treatment because he was not allowed to go to the emergency room when he sprained or strained his ankle. Peebles does not present any evidence which would establish a *prima facie* case because, even if it is assumed he suffered an adverse employment action, he has identified no one who was similarly situated yet treated differently. Moreover, Schulman has presented a legitimate non-discriminatory reason for its action, an "Allowable Emergency Room Visits" policy which provided that employees who suffered severe cuts, second or third degree burns, broken bones or became unconscious could go to the emergency room. Otherwise, the employee was to be seen by one of Schulman's panel physicians.

(Peebles Depo. Ex. 14). Peebles admits that his injury did not fall within the policy. (*Id.* at 160-162). However harsh the policy may seem in a particular circumstance, Peebles has not shown that his not being able to go to the emergency was for any reason other than that the policy did not allow it. That is, he has not shown "an illegal motivation was *more* likely than that offered by the defendant." *Smith,* 220 F.3d at 759 (emphasis in original). Schulman is entitled to summary judgment on this claim as well.

iv. *Remaining Claims*

***14** Apart from the foregoing, Peebles sets forth other allegations which he is arguably using to support his contention that he was subjected to disparate treatment on account of his race. He claims, for example, that African American employees were watched more closely than whites and that they were required to take breaks at a specific time, whereas whites could take breaks as they desired. Leaving aside that only conclusory allegations have been presented in support of those allegations, monitoring employees' work does not, standing alone, constitute an adverse employment action. *Birch v. Cuyahoga County Probate Court,* 392 F.3d 151, 169 (6th Cir.2004).

As for Peebles' claims that he and other African American employees were required to take breaks at a specified time, that the third shift did not receive pizza while employees on the other shifts did, and that employees on the third shift had to clean up the messes made by the employees on the second shift, Peebles has again failed to show any adverse action or that others who were similarly situated but outside the class were treated differently.

Even if Peebles was required to take breaks at a particular time, this does not amount to an adverse action because, from all outward appearances, he received all of the breaks to which he was entitled. Moreover, an inference of discrimination cannot be raised because "whites" were allowed to take breaks when they wanted since Peebles has presented no evidence that those unidentified employees were similarly situated-they very well could have done different types of work under different supervisors.

Similarly, the fact that the third shift (which Peebles claims was predominantly comprised of African American employees) did not receive pizzas, and that they had to clean up after the second shift does not permit any inference of discrimination because of race. For all the Court knows, pizzas were provided to employees based upon performance or other non-racial reasons and the second shift was sloppier than the third shift. What a jury could not reasonably infer from the conclusory assertions made by Peebles is that race played a role in these things. Regardless, the lack of a pizza or having a clean workspace upon arrival does not constitute a "material change in the terms of employment." As such, Schulman is entitled to summary judgment on these claims.

b. *Peebles' Harassment Claims*

"In order to establish a hostile work environment claim, an employee must show the following: (1) the employee is a member of a protected class, (2) the employee was subjected to unwelcome harassment, (3) the harassment was based on the employee's race, (4) the harassment affected a term, condition, or privilege of employment and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *Moore v. KUKA Welding Systems,* 171 F.3d 1073, 1078-79 (6th Cir.1999). A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Thus, "the plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the employee's ability to do his or her job." *Moore,* 171

Not Reported in F.Supp.2d, 2006 WL 572337 (M.D.Tenn.)
**(Cite as: 2006 WL 572337 (M.D.Tenn.))**

F.3d at 1079.

**\*15** To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." *Williams v. General Motors,* 187 F.3d 553, 562 (6th Cir.1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462 (6th Cir.2000). "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Id.* (quoting *Harris,* 510 U.S. at 23).

In this case, when viewed in light of the totality of the circumstances, Peebles cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of his employment or that a reasonable person would have found the environment abusive. Some of the incidents about which Peebles complains have not been shown to have been based upon his race, while others cannot even be characterized as harassing.

Peebles points to numerous allegations which he says support his hostile work environment claim, including that (1) Bellamy used a sleeve from his Tyvek suit to cover his head; (2) he heard from other employees that Ronnie Day had used a racial slur; (3) the attendance policy was enforced differently with respect to black employees; (4) blacks were watched more closely than whites; (5) whites were allowed to sit in the break room while on light duty whereas blacks were required to work; (6) blacks had scheduled breaks while whites could take their breaks when they desired; and (7) Peebles' machine was sped up by his Supervisor when Peebles was on break.[FN9]

> FN9. Several of these allegations are also claimed to be evidence of disparate treatment.

The first two claims relating to the Tyvek suit incident and Day's alleged slur did not occur in Peebles' presence.[FN10] A claim of harassment "against others, out of Plaintiff's presence and work space ... cannot support submitting a hostile work environment claim to a finder of fact." *Peake v. Brownlee,* 339 F.Supp.2d 1008, 1020 (M.D.Tenn.2003) (citing, *Leibovitz v. New York City Transit Auth.,* 252 F.3d 179, 189 (2d Cir.2001)). Further, with regard to both incidents, when Schulman learned of the events, it immediately investigated the incidents and Peebles neither heard nor witnessed any further similar conduct by either employee. Since Bellamy and Day were co-workers, Peebles can prevail only by demonstrating that Schulman knew or should have known of the harassment but failed to take prompt remedial action. *See, Hafford v. Seidner,* 183 F.3d 506, 513 (6th Cir.1999) ("employer liability for co-worker harassment is based directly on the employer's conduct," and an employer can only be held liable "if it knew or should have known of the charged ... harassment and failed to implement prompt and appropriate corrective action"). The only evidence in this case is that upon learning of the incidents, Schulman took remedial action which was effective. Consequently, Schulman cannot be liable for harassment based on these incidents.

> FN10. Interestingly, the individual who witnessed the Tyvek suit incident filed suit in this Court alleging racial harassment in employment. Judge Campbell found that this incident, even when coupled with numerous other incidents, did not amount to racial harassment as a matter of law. *Brown v. Schulman,* Case No. 3:03-0285 (M.D. Tenn, April 22, 2004).

**\*16** Peebles claims he was subjected to harass-

ment based upon his race in relation to his being terminated under the attendance policy for amassing too many points. As already indicated, however, Peebles has presented no evidence that race was a factor in the assessment (and subsequent removal) of points.

Peebles' general contention that blacks were watched more closely than whites, whites were allowed to sit in the break room while on light duty whereas blacks were required to work, and blacks had to adhere to scheduled breaks but whites did not, are unsupported by any evidence sufficient to present a jury issue. Those allegations are merely conclusory. *See,* 367 F.3d 714, 727 n. 9 (7th Cir.2004)(conclusory allegations that African-Americans had to do more work and received the tougher assignments cannot support a claim of harassment"); *Causey v. Balog,* 162 F.3d 795, 801-02 (4th Cir.1998) (plaintiff's "conclusory statements" that company "treated him less favorably ... without specific evidentiary support, cannot support an actionable claim for [race-based] harassment"); *Doerr v. Colorado Div. Of Youth Serv.,* 95 Fed. Appx. 295, 297 (10th Cir.2004)("conclusory allegations" which "are unsubstantiated do not create an issue of fact sufficient to oppose summary judgment"). "Without evidence that the adverse treatment was based on a protected characteristic, [Plaintiff] has not created a triable issue of fact for a prima facie case of harassment." *Holman,* 154 Fed. Appx. at 503.

Peebles also complains he was harassed when his Supervisor sped up his line when Peebles was on break. This cannot serve as the basis for a racial harassment claim because Peebles admitted in his deposition that he did not have any reason to believe or facts to support his conclusion that his supervisor sped up his machine because Peebles is African American. (Peebles Depo. at 41-42). Instead, he testified the speeding up of the machine was "just a joke, or I don't know." (*Id.* at 42).

Peebles has not presented evidence that suggests the actions about which he complains were taken because of his race, were particularly harassing, or that the actions made his working conditions abusive or intolerable. He certainly has not shown that the acts were pervasive enough to create an environment that a reasonable person would find hostile or abusive. While "mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility," *Bowman,* 220 F.3d at 412, this Court cannot conclude a rational jury could determine Peebles was subjected to a hostile work environment. Accordingly, Schulman is entitled to summary judgment on Peebles' hostile work environment claim.

4. *Robinson's Claims*

Like Peebles, Robinson claims he was treated differently than other Schulman employees because of his race. He also claims he was subjected to racial harassment.

a. *Robinson's Disparate Treatment Claims*

i. *Denial of Promotions*

***17** Robinson's primary complaint of disparate treatment has to do with his being denied promotions. Since he has no direct evidence that the denial of any promotion was based upon race, he must establish his claim through circumstantial evidence.

To establish a *prima facie* case of racial discrimination based on a failure to promote utilizing circumstantial evidence, "a plaintiff generally must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." *Dews,* 231 F.3d at 1020-21. If the plaintiff creates a presumption of discrimination by establishing a *prima facie* case, the burden, like that already noted in regard to general disparate treatment cases, shifts to the defendant to articulate a legitimate non-discriminatory reason for its action which the plaintiff must then show to be pretextual.

Robinson makes general allegations that he was consistently denied promotions over the years but, for the most part, fails to identify with any particularity when those denials occurred or who actually received the promotions.[FN11] He does identify two situations in which he was passed over for a Certified Lab Technician position-when Johnson and Spurlock were hired for those slots.[FN12] However, his claim with regard to both positions is untimely even under section 1981's four-year statute of limitations because Johnson received his Certified Lab Technician position in September 1997 and Spurlock assumed a similar position in April 1999, but suit was not filed until August 24, 2004. (Peck Aff. ¶¶ 3 & 8).

> FN11. For example, he claimed in his deposition that at some point in the past he was desirous of obtaining supervisory positions over the production lines and that he "thinks" he verbally told the production superintendent at that time about his desire. (Robinson Depo. at 52-58). Leaving aside that supervisory positions are not filled based upon seniority but rather qualifications and that Robinson had absolutely no supervisory experience, Robinson does not identify when those positions were open or who filled those positions. This effectively means he cannot possibly establish at least two of the elements of a *prima facie* case-that he was similarly situated to one who received such a position and that he was qualified for the position.

> FN12. At the time, the Lab Supervisor was Victor Johns who was replaced by Bahaii. Robinson generally asserts that Bahaii committed race discrimination in hiring temps into the laboratory instead of Robinson. Exactly when that occurred or in respect to which exact position is not clear. In any event, Robinson believes that whatever animus Baghaii may harbor, it is animus which arises solely from the fact that Baghaii is from the Middle East and Robinson served in Desert Storm. (Robinson Depo. at 23-25).

Even if timely, Plaintiff's claim regarding the position Johnson received fails from the outset because Johnson, like Robinson, is African American. Moreover, with regard to both positions and the *prima facie* case, Robinson must show similar qualifications; in other words, he must establish that Johnson and Spurlock were lesser-qualified applicants. *Roh v. Lakeshore Estates, Inc.,* 241 F.3d 491, 497 (6th Cir.2001). The evidence before the Court shows that Johnson and Spurlock had significantly more experience in laboratory work than Peebles. At the time of his appointment to the Certified Lab Technician, Johnson had more than nine years of experience in laboratory work compared to three years for Robinson. When Spurlock was promoted, he had nearly twenty-five years of prior laboratory experience as compared to Robinson's then five years of experience. (*Id.* ¶¶ 12-13). This difference in experience has been proffered by Schulman as the legitimate non-discriminatory reason for its actions regarding Johnson and Spurlock. Aside from his own belief regarding respective qualifications, Robinson presents absolutely nothing in the way of evidence which would permit the conclusion that Schulman's stated reason was false. *See, Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987) (plaintiff's "perception of his competence, and the incompetence of those competing against him, is irrelevant").

**\*18** Robinson also claims that he was wrongfully denied promotion to a Maintenance Technician in 2003. Admittedly he twice failed to pass the requisite test even though he, like others, was provided with a study booklet and given the name of a resource person at Nashville Tech who was available to help in preparation for the test. (Robinson Depo. at 79).[FN13] Nevertheless he claims his denial of promotion was discriminatory in that the test was rewritten because he had evidenced an interest in the position. The chronology of

events does not support this conclusion.

> FN13. It appears that all of the employees who took the test did not pass and the position was retracted at that time. (Robinson Depo. at 82-84). Ultimately, the Maintenance Technician position was filled by an outside hire. (Dillard Aff. ¶ 51).

The test was changed with the acquiescence of the union. The business agent for the union was informed by letter dated December 6, 2002, that a new policy was being implemented for maintenance department employees. (Robinson Depo. at 74). Robinson claims he expressed an interest in the position on January 4, 2003, shortly after an opening arose. (*Id.* at 73).

Despite this chronology of events, Robinson states in his affidavit that "the maintenance test was created by A. Schulman at or about the time that I showed interest" and that "[i]t was thereafter 'revised' to have been created by Nashville Tech at a later date." (Robinson Aff. ¶¶ 16 & 17). From that he suggests some sort of conspiracy between Schulman and Nashville Tech to "revise" the test because he had expressed an interest in the position. However, unadorned assertions of a conspiracy will not suffice to defeat a properly supported motion for summary judgment. *Mulhall v. Ashcroft,* 287 F.3d 543, 552 (6th Cir.2002); *Palesch v. Missouri Comm'n on Human Rights,* 233 F.3d 560, 569 (8th Cir.2000).

Regardless, it is undisputed that Robinson did not pass the requisite test and therefore he was not qualified for the position. Because he was not qualified and because he points to no one who also did not pass the test at the same time but was promoted to a Maintenance Tech position, he cannot establish a *prima facie* case.

*ii. Denial of Training Opportunities*

Because Robinson was no longer working in the lab in January 2003, his laboratory qualifications were not current. Between January and May of that year, Robinson went to the lab to receive training but claims he was discouraged from taking training because his name was not placed on a list of individuals to receive tracking numbering system training. (Robinson Depo. at 128-129, 132). After e-mailing Baghaii, he was allowed to continue training. (Robinson Depo. at 130).

Robinson has not presented a jury question on his claim that he was wrongfully denied training opportunities for at least two reasons. First, he admits that he was not treated differently than any of his co-workers, including white co-workers because he acknowledges his situation was "unique" and no one turned him away from the lab or told him he could not work on his training. (Robinson Depo. at 131, 137). Second, Robinson has failed to show any sort of adverse action because he did in fact complete the training and was paid overtime for the time spent training in the lab. (Robinson Depo. at 126).

*iii. Transfer to Master Batch*

**\*19** Robinson claims he was subjected to racial discrimination because Schulman failed to permit him to "bump" Teresa Jones out of her Laboratory Technician position when his Material Handler position was eliminated in August 2003 and he was transferred to a position in Master Batch. In his view, he should have been allowed to take Jones' position and Jones should have been moved to Master Batch.

Such a maneuver, however, would have been in direct contravention of Section 11.11 of the CBA which provided that employees in the same job classification are given preference for positions. At the time of Robinson's transfer to Master Batch, he was a Material Handler, whereas Jones was a Laboratory Technician. (Dillard Aff. ¶¶ 58-59).

Complying with the terms of a collective bargaining agreement is a legitimate non-discriminatory reason for failing to transfer an employee. *Haley,* 3 Fed.Appx. at 246-47. Robinson has not shown this reason to be pretextual and

hence summary judgment is appropriate on this claim as well.

*iv. Other claims*

Many of Robinson's other claims of disparate treatment are the same as those presented by Peebles. For example, he complains about his shift not receiving pizza, being observed more closely than others, and having to finish or clean-up work from the prior shift. This Court has already discussed those situations in the context of Peebles' claims and incorporates that discussion herein by reference.

Robinson also claims he was subjected to discrimination when he was assessed points under the attendance policy for missing work due to snow when another, non-minority employee, Tom Hamilton, was not. Robinson does not show, however, that he and Hamilton were similarly situated. Hamilton, along with numerous other employees, both minority and non-minority, were absent from work January 16, 2003, because so much snow had fallen that the company had declared a snow emergency. On the day that Robinson missed work, February 26, 2002, no such snow emergency was declared and, in fact, he identifies no one else who missed work on the day he did because of the snow. (Robinson Depo. at 154-156).

Robinson claims he wrongfully received attendance points for time clock violations and has heard "shop talk" that several white employees (including Nola Medellin, Rodney Bellamy and Paul Biggs) had points they had received removed from their records. Unlike Robinson, however, the employees he identifies all filed grievances while Robinson did not. (Robinson Depo. at 149). An employee who chooses not to pursue a grievance is not similarly situated to an employee who does pursue a grievance. *Washington v. Ford Motor Co.,* 35 Fed.Appx. 160, 162 (6th Cir.2002); *Birone v. Indian River School,* 1998 WL 1329 at *5 (6th Cir.1998).

**B.** *Robinson's Harassment Claim*

Robinson claims he was harassed in July 2002, when co-worker Hodges waived a wrench at him and shouted "it's on you." This claim fails as a matter of law.

**\*20** Robinson concedes that the "harassment" had nothing to do with his race, (Robinson Depo. at 161-162), and hence he cannot establish the third element of a *prima facie* case. Further, this single isolated incident was not so serious as to make the workplace abusive or offensive. *Moore,* 171 F.3d at 1079; *Bowman,* 220 F.3d at 463 (6th Cir.2000). Finally, upon hearing of the incident, Schulman promptly investigated the situation and Hodges never again engaged in any similar conduct towards Robinson. Prompt and corrective action against a non-supervisor who engaged in harassing behavior absolves the employer of liability. *See, Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 873 (6th Cir.1997).

### III. *CONCLUSION*

On the basis of the foregoing, Defendant's "Motion for Summary Judgment" (Docket Entry No. 70) will be granted and this case will be dismissed. Defendant's "Motion to Strike Affidavit of Melvin Motley, Jr." (Docket Entry No. 91) will be granted in part and denied in part and paragraphs 2, 6, 9, 10, 11, 15 and 16 of Motley's Affidavit will be stricken. Defendant's "Renewed Motion to Sever Plaintiffs' Claims, or, in the Alternative, to Order Separate Trials" (Docket Entry No. 94) will be denied as moot.

An appropriate Order will be entered.

M.D.Tenn.,2006.
Peebles v. A. Schulman Inc.
Not Reported in F.Supp.2d, 2006 WL 572337 (M.D.Tenn.)

END OF DOCUMENT