# EXHIBIT 34



Slip Copy, 2014 WL 7187006 (W.D.Tenn.)
**(Cite as: 2014 WL 7187006 (W.D.Tenn.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Tennessee,
Western Division.
Michael KUTZBACK, individually and on behalf of himself and others similarly situated, Plaintiff,
v.
LMS INTELLIBOUND, LLC, a Foreign Limited Liability Company, and CAPSTONE LOGISTICS, LLC, a Domestic Limited Liability Company, Defendants.

No. 2:13–cv–2767–JTF–cgc.
Signed Dec. 16, 2014.

Andrew R. Frisch, Michael N. Hanna, Morgan & Morgan, PA–Plantation, Plantation, FL, for Plaintiff.

Gerald L. Maatman, Jr., Ashley K. Laken, Seyfarth Shaw, LLP–Chicago, Jennifer A. Riley, Laura E. Reasons, Rebecca Sharon Bromet, Seyfarth Shaw, LLP, Chicago, IL, for Defendants.

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO CONDITIONALLY CERTIFY COLLECTIVE ACTION AND FACILITATE NOTICE TO POTENTIAL CLASS MEMBERS**

**ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO TOLL STATUTE OF LIMITATIONS**

CHARMIANE G. CLAXTON, United States Magistrate Judge.

*\*1* Before the Court is Plaintiff Michael Kutzback's Motion to Conditionally Certify Collective Action and Facilitate Notice to Potential Class Members ("Plaintiff's Motion to Certify") (Docket Entry "D.E." # 43) and Plaintiffs' Motion to Toll Statute of Limitations ("Plaintiff's Motion to Toll") (D.E. # 64). The instant motions have been referred to United States Magistrate Judge. (D.E.# 63, # 67).

For the reasons set forth herein, it is recommended that Plaintiff's Motion to Conditionally Certify Collective Action and Facilitate Notice to Potential Class members be GRANTED. Further, Plaintiff's Motion to Toll Statute of Limitations is DENIED without prejudice.

**I. Introduction**

This case arises from allegations that Defendants LMS Intellibound, LLC ("LMS") and Capstone Logistics, LLC ("Capstone"),[FN1] who are third-party warehouse servicers providing logistic services for companies in the warehouse, distribution, and manufacturing industries, violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.,* by failing to pay proper overtime and minimum wages. (Am.Compl.¶¶ 19, 51–69). Plaintiff filed his initial Complaint on October 2, 2013, which he later amended on January 3, 2014.

> FN1. Plaintiff has named LMS and Capstone as co-Defendants. However, Defendants state that two separate companies—LMS and Progressive Logistics Services ("PLS")—merged to form Capstone in September 2011. (Def.'s Resp. to Mot. to Certify, Exh. 1 ("Gairhan Decl.") ¶ 5). For purposes of clarity, the Court will simply refer to LMS and Capstone as "the Company" or "Defendants."

Plaintiff alleges that Defendants operate approximately 239 locations nationwide. (*Id.* ¶ 20). Plaintiff alleges that he was hired to work as a non-exempt "Unloader," otherwise known as a "Lumper" (hereinafter "Unloader"), in or about June 2011. (*Id* . ¶ 21). Plaintiff alleges that he worked as a non-exempt Unloader until August 2012, during which time he was compensated on a production basis as determined by the number and weight of the trucks unloaded. (*Id.* ¶ 24). Plaintiff alleges that, during all times relevant to his claims, he worked in excess of forty hours within a workweek but was not properly compensated for all of

Slip Copy, 2014 WL 7187006 (W.D.Tenn.)
**(Cite as: 2014 WL 7187006 (W.D.Tenn.))**

his overtime hours. (*Id.* ¶¶ 25–27). Specifically, Plaintiff alleges that Defendants' "Team Leads" and/or Managers "systematically and consistently clocked-out its Unloaders while still working, resulting in off-the-clock hours worked." (*Id.* ¶ 28). Plaintiff alleges that the "pattern and practice of clocking-out Unloaders while still working is a nationwide practice." (*Id.* ¶ 29). Plaintiff alleges that these practices resulted in a failure to pay both overtime and minimum wages in violation of the FLSA from June 2011 to present. (*Id.* ¶¶ 31–34). Plaintiff further alleges that Defendants have failed to maintain proper time records as mandated by the FLSA. (*Id.* ¶ 34d).

As to the proposed collective action, Plaintiff alleges that he and the proposed opt-in plaintiffs are or were all non-exempt Unloaders employed Defendants and that they performed the same or similar job duties as one another. (*Id.* ¶ 37). Plaintiff alleges that all of these non-exempt Unloaders were paid in the same manner, namely on a by-the-truck or piece-rate basis. (*Id.* ¶ 38). Plaintiff alleges that Defendants uniformly require as their policy or practice all proposed opt-in plaintiffs to work off the clock in the aforementioned manner, thus failing to pay them their FLSA-mandated minimum wages and/or overtime wages. (*Id.* ¶¶ 39–42). Thus, Plaintiff's Amended Complaint proposes that the proper collective action members should be defined as follows:

> **\*2** All production-only "Unloaders" (a/k/a "Lumpers") who worked for Defendants, nationwide, within the last three years, who worked in excess of 40 hours in one or more workweeks and were not compensated at one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in one or more workweeks and were not compensated at a rate at least equivalent to the federal minimum wage in one or more workweeks as required by the FLSA.

As to the causes of action, Count I alleges that Defendants violated Sections 207 and 211 of the FLSA, 29 U.S.C. §§ 207 & 211, and 29 C.F.R. §§ 516.2 & 516.4 by failing to compensate Plaintiff and the proposed opt-in plaintiffs for the overtime hours worked and by failing to maintain proper time records. Count II alleges that Defendants violated Section 206 of the FLSA, 29 U.S.C. § 206, by failing to compensate Plaintiff and the proposed opt-in plaintiffs the federally mandated minimum wage. Count III requests declaratory relief under the FLSA and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

On February 18, 2014, Plaintiff filed his Motion to Certify requesting the entry of an Order permitting, under Court supervision, notice to all Unloaders who were employed by Defendants within the last three years and were compensated on a production basis. Specifically, Plaintiff's Proposed Notice states as follows:

> ***IF YOU ARE OR WERE, AT ANY TIME BETWEEN OCTOBER 02, 2010 TO THE PRESENT, AN UNLOADER (A/K/A "FLUMPER") WHO WAS NOT PAID OVERTIME COMPENSATION IN WEEKS WHERE YOU WORKED MORE THAN FORTY HOURS WITHIN A WORK WEEK AND/OR NOT PAID MINIMUM WAGE FOR ALL HOURS WORKED, A COLLECTIVE ACTION LAWSUIT MAY AFFECT YOUR RIGHTS.***

(Pl.'s Mot. to Certify, Exh. 1). At the time of the filing of the Motion to Certify, seven opt-in plaintiffs had joined the suit, including six who provided declarations in support thereof. (Mot. to Certify, Collective Exh. E & D.E. # 5, # 6, # 7, # 8, # 9, # 10, # 33). Since the filing of the Motion to Certify, another opt-in plaintiff has joined the suit. (D.E.# 61).

On April 2, 2014, Defendants responded that Plaintiff's Motion to Certify should be denied on at least four independent grounds: (1) Plaintiff has not established that he and the proposed opt-in plaintiffs are similarly situated because he has not presented any evidence that they were victims of a common policy or plan that violated the FLSA; (2)

Plaintiff has not established that he and the proposed opt-in plaintiffs are similarly situated because the evidence demonstrates vastly differing employment conditions of the more than 25,000 proposed opt-in plaintiffs who worked at hundreds of work sites for over 1,000 different managers with different timekeeping and compensation requirements; (3) Plaintiff has failed to established that a collective action of his claims would be manageable; and, (4) Plaintiff has only brought forth the allegations of a "microscopic fraction of a proposed collective active," and Defendants have brought forth contrary evidence that directly refutes his allegations.

**\*3** On October 10, 2014, Plaintiff filed his Motion to Toll asserting that the statute of limitations should be tolled for potential opt-in plaintiffs as of February 18, 2014, the date of the filing of the Motion to Certify. On October 24, 2014, Defendants filed a Response to Plaintiff's Motion to Toll arguing that the "extraordinary" relief requested by Plaintiff is not consistent with the statutory scheme set forth under the FLSA. Defendants further assert that tolling is inappropriate because nothing has prevented or is preventing any potentially aggrieved individuals from pursuing their claims by filing their own suits or opting-in to this action.

**II. Proposed Analysis**

**A. Motion to Certify**

The FLSA provides, in pertinent part, the following on pursuing collective actions:

An action to recover the liability [for unpaid minimum wages or unpaid overtime compensation] ... may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). The two key requirements of Section 216(b) are that the plaintiffs must be similarly situated and that all plaintiffs must signal in writing their affirmative consent to participate in the action. *Comer v. Wal–Mart Stores, Inc.,* 454 F.3d 544, 546 (6th Cir.2006) (citing *Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 167–68 (1989)).

Certification of a FLSA collective action is a two-phase process. *Comer,* 454 F.3d at 546; *O'Brien,* 575 F.3d at 583. "The first takes place at the beginning of discovery," and any certification is "conditional and by no means final." *Comer,* 454 F.3d at 546 (internal quotations omitted). The court should rely upon the pleadings and any filed affidavits in determining if conditional certification is appropriate. *James Allen Frye v. Baptist Memorial Hospital,* No. 2:07–cv–02708–SHM–cgc, 2010 WL 3862591, at \*2 (W.D.Tenn. Sept. 27, 2010). At this stage, a plaintiff must only "make a modest factual showing" that "his position is similar, not identical" to the positions held by the other proposed opt-in plaintiffs. *Comer,* 454 F.3d at 546 (citations omitted). "[T]his determination is made using a fairly lenient standard, and typically results in conditional certification of a representative class." *Id.* (citations omitted); *see also White v. MPW Indus. Srvs.,* 236 F.R.D. 363, 366–67 (E.D.Tenn. Mar. 21, 2006) (citing cases). "To require more at this stage of the litigation would defeat the purpose of the two-stage analysis." *White,* 236 F.R.D. at 368.

The second phase of an FLSA collective action is typically precipitated by a motion for decertification, *White,* 236 F.R.D. at 366 (quoting *Mooney v. Aramco Srvs. Co.,* 54 F.3d 1207, 1213–14 (5th Cir.1995)), and it does not occur until "after all of the opt-in forms have been received and discovery has concluded," *Comer,* 454 F.3d at 546. At this point, "trial courts examine much more closely the question of whether particular members of the [collective action] are, in fact, similarly situated." *Id.* Because "the court has much more information

[upon which] to base its decision" during the second phase, it employs a "stricter standard" for final certification. *Id.*

**\*4** The FLSA does not define "similarly situated." *O'Brien,* 575 F.3d at 584. The United States Court of Appeals for the Sixth Circuit has also not defined "similarly situated" but has concluded that the consideration of whether violations are alleged to have occurred at "about the time and place and approximate manner is a starting point for understanding what similarly situated means." *Id.* at 585 (internal quotations omitted). However, the court cautioned that requiring causes of action to accrue at about the same time and place in the approximate manner of the named plaintiff "is more demanding than what the statute requires." *Id.* Further, the court stated that "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Id.* Yet while such a policy is one manner of demonstrating that the plaintiffs are similarly situated, "showing a unified policy of violations is not required" for class certification. *Id.* at 584 (internal quotations omitted). Employees may also be similarly situated if the claims are "unified by common theories of defendants' statutory violations," although this is also not a requirement. *Id.* at 585 (concluding that proposed opt-in plaintiffs were similarly situated because the claims alleged two common means of violating the FLSA—"forcing employees to work off the clock and improperly editing time-sheets.").FN2

> FN2. This Court notes that the *O'Brien* court was considering an appeal of the district court's ruling at the *decertification* stage. *Id.* at 584. Thus, it delved into the more extensive review of factors appropriate for that "final-certification" phase, including the "factual and employment settings of the individual[ ], the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." *Id.* However, the Court relies on *O'Brien* as guidance from the Sixth Circuit on general principles regarding the similarly situated analysis of which this Court must only consider, at this conditional certification stage, under the "fairly lenient standard" based upon a "modest factual showing." *Comer,* 454 F.3d at 546; *see also Rodney G. Parr v. Hico Concrete, Inc.,* No. 3:10–1091, 2011 WL 3293391, at \*2–\*3 (M.D.Tenn. Aug. 1, 2011) (utilizing the *O'Brien* guidance on the meaning of "similarly situated" in its consideration of conditional certification).

The instant case is at the first phase of conditional certification where the Plaintiff must only meet the "fairly lenient" showing. To begin its analysis, the Court will summarize what facts are shown by the evidence presented by Plaintiff and opt-in plaintiffs in support of conditional certification and the evidence presented by Defendants in opposition thereto.

Plaintiff sets forth that Defendants operate in 240 locations in over forty states across the United States. (Pl.'s Mot. to Certify, Exh. C). Plaintiff has attached his own declaration and the declarations of six opt-in plaintiffs who were employed by Defendants as Unloaders at the following locations: Memphis, Tennessee; Southaven, Mississippi; Miami, Florida; Jacksonville, Florida; and, Aberdeen, Maryland. (Pl.'s Mot. to Certify, Composite Exh. E, Declaration of Michael Kutzback ("Kutzback Decl.") ¶ 23, Declaration of Andre Crutchfield ("Crutchfield Decl.") ¶ 4, Declaration of Seadrick Gantt ("Gantt Decl.") ¶ 4, Declaration of Fredrick Murray ("F. Murray Decl.") ¶ 4, Declaration of Terry Murray ("T. Murray Decl.") ¶ 4, Declaration of Joel Palmer ("Palmer Decl.") ¶ 4, Declaration of Bobby Stevens ("Stevens Decl.") ¶ 4). Plaintiff and the opt-in plaintiffs state that their primary duties were to unload trucks and break down pallets re-

**Slip Copy, 2014 WL 7187006 (W.D.Tenn.)**
**(Cite as: 2014 WL 7187006 (W.D.Tenn.))**

ceived. (Kutzback Decl. ¶ 5; Crutchfield Decl. ¶ 5; Gantt Decl. ¶ 5; F. Murray Decl. ¶ 5; J. Murray Decl. ¶ 5; Palmer Decl. ¶ 5; Stevens Decl. ¶ 5). Plaintiff and the opt-in plaintiffs state that they were compensated on a production basis that was determined by the number and weight of the trucks unloaded, and Plaintiff additionally states that all Unloaders at the Memphis, Tennessee and Southaven, Mississippi locations were compensated in this manner. (Kutzback Decl. ¶ 6; Crutchfield Decl. ¶ 6; Gantt Decl. ¶ 6; F. Murray Decl. ¶ 6; J. Murray Decl. ¶ 6; Palmer Decl. ¶ 6; Stevens Decl. ¶ 6).

*5 Plaintiff further states that he and all Unloaders at the Memphis, Tennessee and Southaven, Mississippi locations were required to remain on duty at all times during their shifts but were not compensated for their time or overtime if trucks arrived late or failed to arrive at all due to Defendants' compensation scheme. (Kutzback Decl. ¶ 7). The opt-in plaintiffs state that Defendants' intentionally kept inaccurate time records for them and that their pay stubs reflected significantly fewer hours than those actually worked, which resulted in a failure to pay minimum wages and overtime wages. (Crutchfield Decl. ¶¶ 9–11; Gantt Decl. ¶¶ 9–11; F. Murray Decl. ¶¶ 9–11; J. Murray Decl. ¶¶ 9–11; Palmer Decl. ¶¶ 9–11; Stevens Decl. ¶¶ 9–11). Specifically, Plaintiff and the opt-in plaintiffs state that Defendants' managers routinely clocked out Unloaders while they continued working in a concerted effort to avoid paying Unloaders overtime. (Kutzback Decl. ¶ 12; Crutchfield Decl. ¶ 8; Gantt Decl. ¶ 8; F. Murray Decl. ¶ 8; J. Murray Decl. ¶ 8; Palmer Decl. ¶ 8; Stevens Decl. ¶ 8). Plaintiff and opt-in plaintiffs each report that they worked on average ten hours of unpaid overtime each week. (Kutzback Decl. ¶ 17; Crutchfield Decl. ¶ 12; Gantt Decl. ¶ 12; F. Murray Decl. ¶ 12; J. Murray Decl. ¶ 12; Palmer Decl. ¶ 12; Stevens Decl. ¶ 12). The opt-in plaintiffs each state that, to their knowledge, "this off-the-clock work, resulting in unpaid minimum wages and overtime premiums, is a company-wide practice." (Crutchfield Decl. ¶ 16; Gantt Decl. ¶ 16; F. Murray Decl. ¶ 16; J. Murray Decl. ¶ 16; Palmer Decl. ¶ 16; Stevens Decl. ¶ 16). Plaintiff further states that he has spoken with managers in Nashville, Tennessee, Jacksonville, Florida, and Goodlettsville, Tennessee who have confirmed that the Company has "a common practice whereby it forces its employees to work off-the-clock hours" in these locations and in every location where these managers, who were often relocated, had worked. (Kutzback Decl. ¶¶ 23–25).

Plaintiffs evidence demonstrates that Defendants advertise openings for Unloaders at nationwide locations on the career section on their website.[FN3] (Pl.'s Mot. to Certify, Exh. F). Plaintiffs have provided eighty-four job postings for Unloader positions in sixty-two locations in twenty-nine states that specify that compensation is based upon production. (Pl.'s Mot. to Certify, Composite Exh. G). Plaintiffs have provided eighty-seven job postings for Unloader positions in sixty-five locations in thirty states that specify that the performance of pre-shift work is required. (*Id.*) Plaintiffs have provided fifty-five job postings in forty-two locations in twenty-five states where the job shift is listed as lasting until finished, with others mentioning "possible overtime" or "overtime as needed." (Pl.'s Mot. to Certify, Composite Exh. H). Virtually all of the job postings describe the Unloader position as requiring pre-shift checks of equipment, unloading merchandise, breaking and restacking product from pallets, and verifying the product and quantity received. (*See generally, id.*)

> FN3. The career section of Defendants' website is located at the following internet address:http://www.capstonelogistics.com/careers.aspx.

*6 Finally, Plaintiffs state that this is not the first lawsuit of this nature against Defendants. Specifically, Plaintiffs state that at least two other lawsuits have been filed against Defendants on behalf of Unloaders regarding similar off-the-clock allegations at Defendants' warehouses in Amarillo, Texas

Slip Copy, 2014 WL 7187006 (W.D.Tenn.)
**(Cite as: 2014 WL 7187006 (W.D.Tenn.))**

and Allentown, Pennsylvania. *See Cabrales v. LMS Intellibound, LLC & Capstone Logistics, LLC,* No. 2:13–cv–00161–j (N.D.Tex. Aug. 28, 2013); *Simmons v. LMS Intellibound,* 5:12–cv–03908–JKG (E.D.Penn. July 11, 2012).

In opposition to Plaintiff's evidence, Defendants state that it services warehouses for more than sixty-five clients in a wide variety of industries, including food, tire, and mattress distributers and retail businesses. (Gairhan Decl. ¶¶ 5, 7). Defendants employ approximately 6,362 individuals as Warehouse Associates, also known as Unloaders or Lumpers, across the country. (*Id.* ¶ 6). Defendants state that it currently employs anywhere from one to forty-three Unloaders at each of its more than 257 work sites in forty-three states. (*Id.*) Over the past three years, Defendants have employed more than 25,000 individuals as Unloaders at approximately 262 work sites. (*Id.*)

When Capstone was formed by the merger of LMS and PLS, Defendants combined over 210 work sites—including 90 LMS work sites and 120 PLS work sites—under common ownership. (*Id.* ¶¶ 2, 17). Former LMS sites continued to operate under LMS time and pay practices, while former PLS sites continued to operate under PLS time and pay practices. (*Id.* ¶ 17). In or around April 2012, Defendants began to change certain policies and practices at certain LMS and PLS sites but left other polices and practices intact. (*Id* . ¶ 22). For example, Defendants changed the compensation structure at certain PLS sites but left other PLS sites under the old compensation system. (*Id.*)

The standard duty of the Unloaders is to unload products from trucks at warehouse facilities, although the type of product varies greatly depending upon the facility and shift. (*Id.* ¶¶ 8–9). Some facilities also employ Unloaders to perform other tasks, such as patrolling the loading docks for collection and removal of debris, sweeping the floors, maintaining lawns, and sorting through pallets for "bad wood" and transporting that material to the appropriate area. (*Id.* ¶¶ 11, 30; Def.'s Resp. to Mot. to Certify, Exh. 1–M, Exh. 11 ¶ 7 & Exh. 20 ¶ 10).

Unloaders report to either Team Leads, Supervisors, Site Managers, or non-Lead Unloaders. (Gairhan Decl. ¶¶ 13–16). Defendants currently employ approximately 330 Team Leads, 252 Supervisors, and 189 Site Managers. (*Id.* ¶¶ 13, 16). Over the past three years, Defendants have employed at least 1,000 individuals as Team Leads, Supervisors, and Site Managers. (*Id.* ¶ 16).

Defendants compensate Unloaders according to five different systems—the Production Pay System; the Modified Production Pay System; the Pool Pay System; the Hourly Pay system (as compensation for non-unloading tasks) plus the Production, Modified Production, or Pool Pay System (as compensation for unloading tasks); and the Lead Pay System for non-Lead Unloaders (as additional compensation for undertaking the Lead role) plus the Production, Modified Production, or Pool Pay System (as compensation for unloading tasks). (*Id.* ¶¶ 17–30 & Exhs. A–C).[FN4] The details of the Production Pay System, the Pool Pay System, and the Lead Pay System vary further depending upon the location (*Id.* ¶¶ 14, 19, 21–23, 40–44), as does the process for load distribution among Unloaders (*Id.* ¶¶ 40–48). Despite the five different compensation structures, the variations within each system, and the different load distribution methods, either the base wages or the entire wages for most if not all [FN5] Unloaders is calculated either under the Production Pay System, the Modified Production Pay System, or the Pool Pay System, which were the main systems in place at the PLS and LMS sites before the merger. (*Id.* ¶¶ 17–30).

> [FN4]. The variations in compensation schemes and load distribution processes appear to be based, at least in part, upon the differing practices between PLS and LMS sites before the merger and upon the need to meet certain goals or provide certain incentives depending upon the nature of the work. (*Id.* ¶¶ 17–30, 40–48). The details of each compensation system is set

forth in the Gairhan Declaration. (*Id.* ¶¶ 17–30).

FN5. It appears that the only Unloaders theoretically who would not have a base wage calculated by either the Production Pay System or Pool Pay System are those who are compensated by the Hourly Pay System and perform no unloading tasks during a pay period. (*Id.* ¶¶ 24, 30). There is no evidence as to whether any Unloaders have been compensated at any time during the last three years in this manner.

**\*7** Regardless of the compensation system, Defendants state that if employee's "actual rate for the week is lower than the minimum wage, the Company increases the Unloader's pay for the week by the difference between the actual rate and the minimum wage by all of the hours that he or she worked." (*Id.* ¶¶ 20, 27). Defendants state that "if an Unloader works more than forty hours [in a workweek], the Company pays one and one-half times the actual rate or the minimum wage (whichever is higher) for those hours" as well as any additional compensation required by state law. (*Id.* ¶¶ 20, 27). Defendants state that Unloaders "hours worked include any time that they spend waiting for trucks." (*Id.* ¶ 45).

Defendants currently operate 120 work sites with one shift, 70 with two shifts, and 35 with three shifts. (*Id.* ¶ 47). "The type and amount of pre-shift and post-shift work also varies by client and location." (*Id.*) Defendants state that the availability of overtime hours also varies drastically by location. (*Id.* ¶ 48). "The amount of overtime often depends on the facility and varies depending on factors such as the customer's shipment volume, current staffing levels at the facility, the time of year, and the effectiveness of the Site Manager's tracking and scheduling methods." (*Id.*)

Defendants timekeeping systems have also varied by workaday and by period, ranging from personal time sheets to sign-in sheets to electronic scan or swipe systems. (*Id.* ¶ 33–34, 36).FN6 The personal-timesheet and sign-in-sheet methods were used at PLS and LMS locations, respectively, before early 2013. (*Id.* ¶ 33–34, 36). In early 2013, the Company began implementing a completely electronic timekeeping system for all Unloaders at all of its facilities, and the process of transferring to this system was complete by April 2013. (*Id.* ¶¶ 36, 39).

FN6. The details of each timekeeping system is set forth in the Gairhan Declaration. (*Id.* ¶¶ 31–39).

Regardless of the timekeeping system utilized, Unloaders have been and continue to be required to review and sign off on their time during the following week certifying as follows: "My signature verifies that the hours on this sheet are correct and accurately reflect the hours I worked." (*Id.* ¶ 34 & Exhs. 1–F & 1–H). Before the merger, LMS's Time and Attendance Policy, which applied to Unloaders, provided as follows: "**If an associate is working, they *MUST* be "clocked" in** —they may *NOT* choose to work off the "clock"—***IT'S THE LAW;*** " "**Any changes made to an associate's 'clock' time must be initialed by the associate;**" and, "**No supervisor or lead should be documenting start and finish times for associates.** It is the associate's responsibility to 'clock' in and out themselves." (*Id.* ¶ 35 & Exh. 1–G at 1 (emphases in original)).

After the merger in January 2013, Capstone promulgated an Associate Handbook that combined the policies of LMS and PLS and are now applicable Company-wide. (Gairhan Decl. ¶ 49, 51 & Exh. 1–I). The Capstone Associate Handbook provides as follows: "Production and Hourly (non-exempt) Associates should accurately record the time they begin and end their work;" "If management allows an Associate to start work, then the Associate must clock in;" "If an Associate is working, they must be clocked in. Associates may not choose to work off the clock." (*Id.* ¶ 49, 51 & Exh. 1–I). The Capstone Associate Handbook further provides that "[t]ampering, altering, [or] falsifying

Slip Copy, 2014 WL 7187006 (W.D.Tenn.)
**(Cite as: 2014 WL 7187006 (W.D.Tenn.))**

time records or recording time on or for another Associate's time record may result in disciplinary action, up to and including termination." (*Id.,* Exh. 1–I at 14). The Capstone Trainer's Handbook, which guides the orientation of new Unloaders, further instructs that "[i]f an Associate is working, they must be clocked in. Associates may not choose to work off the clock" and again prohibits tampering, altering, or falsifying time records or recording time in any manner that is forbidden in the Capstone Associate Handbook. (*Id.* ¶¶ 53, 56 & Exh. 1–L at 15). Defendants further proffer signed acknowledgments from Plaintiff and the opt-in plaintiffs that they received and reviewed the Capstone Associate Handbook. (*Id.* ¶ 52 & Exh. 1–K).

**\*8** In response to the declarations of Plaintiff and the opt-in plaintiffs, Defendants have provided the declarations of six Unloaders from four locations in three states who claim that they have received compensation for all hours worked and that they have been required to accurately report their time by their managers. (*Id.* at Exh. 11 ¶ 28, Exh. 17 ¶ 4, Exh. 19 ¶¶ 10, 12, 18; Exh. 22 ¶ 14; Exh. 23 ¶¶ 7, 10, 14; Exh. 25 ¶¶ 9, 15). One Unloader further states that he has "never witnessed anyone from the Company instructing or encouraging anyone else to work without recording time." (*Id.* Exh. 19 ¶ 12). Defendants have further provided the declarations of six Team Leads, Supervisors, and Site Managers from the same four locations [FN7] in three states who were aware of and followed Company policies regarding accurate timekeeping. (*Id.* at Exh. 2 ¶¶ 14, 16–18, 37–38, Exh. 3 ¶¶ 19–22, 30–33, Exh. 4 ¶¶ 16–18, 31–34, Exh. 6 ¶¶ 12–13, 25–26, Exh. 8 ¶¶ 14, 17–21, Exh. 9 ¶¶ 12, 14, 16–20). These Team Leads, Supervisors, and Site Managers state that they never witnessed anyone instruct or encourage an Unloader to work without recording time (*Id.* at Exh. 2 ¶ 17, Exh. 3 ¶ 22, Exh. 4 ¶ 17, Exh. 8 ¶ 20 & Exh. 9 ¶ 16), that they had never been instructed or instructed others to under-report any Unloader's work hours (*Id.* Exh. 2 ¶ 18, Exh. 3 ¶¶ 20–21, Exh. 4 ¶ 18, Exh. 6 ¶¶ 12–13, Exh. 8 ¶¶ 17–18 & Exh. 9 ¶¶ 14, 17), and had never under-reported any Unloader's work hours (*Id.* Exh. 2 ¶ 18, Exh. 4 ¶ 16, Exh 6 ¶ 13, Exh. 8 ¶¶ 17–18 & Exh. 9 ¶ 14).

> [FN7.] Defendants' declarations by Unloaders and Site Managers, Supervisors, and Team Leads all come from four locations—Farr West, UT; University Park, IL; Glendale, CA; and, Riverdale, CA. (*Id.* Exhs. 2, 3, 4, 6, 8, 9, 11, 17 19, 22, 23 & 25).

Defendants also specifically contest the allegations of two opt-in plaintiffs. First, Defendants state that the pay records for opt-in plaintiff Gantt demonstrate that he received both a "minimum wage true-up" and overtime pay. (*Id.* at Exh. 36 ¶ 8 & Exh. 36–A). Second, Defendants state that the personnel and pay records for opt-in plaintiff Palmer demonstrate that he was compensated for 632.72 overtime hours. (*Id.* at Exh. 36 ¶ 11).

Having determined what facts are shown by the evidence presented by Plaintiff and the opt-in plaintiffs and Defendants, the Court must continue to determine whether such facts show that the Plaintiff and proposed opt-in plaintiffs are similarly situated under the FLSA. A natural starting point for the analysis is to consider Defendants' objections to the conditional certification. First, Defendants argue that Plaintiff has not produced any evidence that he and the proposed opt-in plaintiffs are similarly situated because he has not shown that they were victims of a common policy or plan that violated the FLSA. While some courts have required such a showing, the Sixth Circuit has explicitly stated that the showing of a unified policy of violations is not required to pursue an FLSA collective action. *O'Brien,* 575 F.3d at 584; *see also Thompson v. Bruister & Assoc.,* 967 F.Supp.2d 1204, 1213 (M.D.Tenn. Aug. 23, 2013). Accordingly, it is recommended that the argued lack of a common policy or plan is not an obstacle to conditional certification. [FN8][FN9]

> [FN8.] It is worth noting that Plaintiff con-

tends that there is a common policy or plan by Defendants to violate the FLSA's overtime and minimum wage requirements; however, as the Sixth Circuit has held that a common policy or plan is not required for conditional certification, the Court need not further consider this dispute.

FN9. While discussing Defendant's objection that Plaintiff's have failed to present evidence of a common policy or plan to violate the FLSA, the Court would be remiss without noting that Defendants have presented evidence that they had and continue to maintain a policy requiring compliance with the FLSA. However, this Court recommends that evidence of such a policy does not prevent conditional certification. As stated by one district court, regardless of a company's official policy, when presented with allegations to the contrary, "it remains to be determined in this action whether [the company] had a de facto policy that required employees to perform work off-the-clock and without pay. The mere fact that [the company's] written policy indicates that [it] will not violate the FLSA does not insulate [it] from a FLSA action." *Darvette Smith v. Family Video Movie Club, Inc.,* No. 11 C 1773, 2012 WL 580775, at *3 (N.D.Ill. Feb. 22, 2012); *see also Blakes v. Illinois Bell Telephone Co.,* No. 11 CV 336, 2011 WL 2446598, at *5 (N.D.Ill. June 15, 2011) (stating that an "unwritten de facto policy that discourages employees from seeking compensation for work performed outside their shift and that forces them to perform uncompensated work off-the-clock" violates that FLSA and that courts "regularly allow plaintiffs to pursue collective actions under the FLSA in these circumstances ... because regardless of what a company's official policy says, some evidence that a separate policy is enforced by more than a rogue manager or two supports a conclusion that similarly situated employees were subject to a common practice violating the FLSA" (internal quotations omitted)).

**\*9** Next, Defendants argue that Plaintiff is not similarly situated to the proposed opt-in plaintiffs due to the varied employment conditions of the 25,000 Unloaders as detailed above. Defendants assert that the differing compensation schemes, managers, and timekeeping mechanisms, among many other factors, demonstrate that the proposed opt-in plaintiffs worked under vastly different conditions over different periods of time. However, the Sixth Circuit has stated that the "factual and employment settings of the individual [ ] plaintiffs" are appropriately addressed in a district court's "final-certification" decision rather than at the conditional certification stage. *O'Brien,* 575 F.3d at 584 (quoting 7B Wright, Miller & Kane § 1807 at 497 n.65). In accordance with *O'Brien,* this Court and other courts have also stated that the "plaintiff's disparate factual employment settings" are appropriately addressed "at the second stage" of the FLSA process when decertification is considered. *White,* 236 F.R.D. at 373 (quoting *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1108 (10th Cir.2001)) (internal quotations omitted); *Frye,* 2010 WL 3862591, at *3; *Robert D. Ray v. Motel 6 Operating, Limited Partnership.,* No. 3–95–828, 1996 WL 938231, at *3 (D.Minn. Mar. 18, 1996) (noting that differences in "age, year of termination, type of termination, division in the company in which they worked, employment status, supervisors and salaries" were the type of individualized issues to be properly considered at the decertification stage)). Accordingly, it is recommended that the arguably disparate factual employment settings is not an obstacle to conditional certification.

Next, Defendants argue that Plaintiff has failed to establish that a collective action trial of his claims would be manageable. The Sixth Circuit has held that "the degree of fairness and procedural impact of certifying the action as a collective action"

Slip Copy, 2014 WL 7187006 (W.D.Tenn.)
**(Cite as: 2014 WL 7187006 (W.D.Tenn.))**

is also properly considered by a district court at the final-certification stage rather than the conditional-certification stage. *O'Brien,* 575 F.3d 584; *see also Frye,* 2010 WL 3862591, at \*3. Further, to the extent that the manageability of the collective action is a factor of the potential "fact-intensive inquiries and individual defenses," as argued by Defendants, the Sixth Circuit has likewise stated that these considerations are proper during the second rather than the first step of the FLSA certification process. *O'Brien,* 575 F.3d 584. Accordingly, the argued lack of manageability of the proposed collective action is not an obstacle to conditional certification.

Finally, Defendants argue that Plaintiff's evidence pertains to "the allegations of a microscopic fraction of a proposed class action" and is refuted by their own "significant contrary evidence ." Defendants are correct that Plaintiffs' evidence is not overwhelming at this stage when considering that there are approximately 25,000 proposed opt-in plaintiffs. Specifically, Plaintiffs' evidence alleges as follows: (1) Plaintiff's compensation was in violation of the FLSA; (2) the six opt-in plaintiffs' compensation was in violation of the FLSA; (3) all Unloaders at the Memphis, Tennessee and Southaven, Mississippi locations were compensated in violation of the FLSA; (4) managers in Nashville, Tennessee, Jacksonville, Florida, and Goodlettsville, Tennessee believe the Company maintains "a common practice whereby it forces its employees to work off-the-clock hours" in these locations and in every location where these managers, who were often relocated, had worked; and, (5) that Plaintiff and the six opt-in plaintiffs believe that the "off-the-clock work, resulting in unpaid minimum wages and overtime premiums, is a company-wide practice." While Plaintiffs certainly have significant evidence as to the scope of the alleged violations, it undoubtedly represents only a small portion of the Unloaders employed by Defendants.

**\*10** Defendants have also challenged the strength of Plaintiffs evidence by setting forth their Company policies prohibiting off-the-clock work as well as the presenting evidence of six Unloaders and six managers from four locations in three states stating that they were compensated in accordance with the FLSA, that they never have been instructed or never instructed others to under-report any Unloader's hours, and that they never witnessed anyone from the Company instructing or encouraging any Unloader to work without recording time. While Defendants' evidence is also not inconsequential, like Plaintiffs', it represents only a fraction of the estimated 25,000 Unloaders that are the proposed opt-in Plaintiffs in this collective action.

Ultimately, at this early stage, the Court has only been presented with the allegations of seven Unloaders on from five locations in four states on Plaintiff's behalf and six Unloaders and six managers from four locations in three states on Defendants' behalf. Thus, neither the parties nor the Court are privy to the allegations of the overwhelming majority of the members of the proposed collective action. The primary reason for this is that no notice has issued and discovery has not yet begun.[FN10]

> FN10. The Court's December 11, 2013 Scheduling Order states that the parties have agreed to stay all discovery pending the Court's ruling on Defendants' Motion to Dismiss and Plaintiffs' Motion for Conditional Certification.

However, even though the evidence presented at this stage only sets forth the claims of a relatively small number of employees, two district courts within the Sixth Circuit have permitted conditional certification based upon evidence that is significantly less extensive than that presented by Plaintiff. In *Candy Sniffen v. Spectrum Industrial Services,* No. 2:06–CV622, 2007 WL 1341772 (S.D .Ohio Feb. 13, 2007), the court concluded that the affidavits of two plaintiffs claiming that defendants willfully refused to pay proper overtime wages in addition to the two plaintiffs' payroll records "clearly" met their burden for conditional certification of their FLSA collective action. *Id.* at \*2. In *Parr,* the court concluded that the sworn declara-

tions of plaintiff and two other former employees claiming that defendant forced them to work off-the-clock and failed to pay overtime were sufficient for conditional certification of their FLSA collective action. 2011 WL 3293391 at *2. The *Parr* court opined that conditional certification was not precluded even though defendant had "submitted evidence in the form of two affidavits that tends to reveal weaknesses in the plaintiffs' case." *Id.* at *3. The *Parr* court further reasoned that, "[b]ecause Plaintiff's evidence suggests the existence of common theories that resulted in Defendant's violations of the FLSA, the plaintiffs have met their fairly lenient burden." (internal quotations omitted)). Accordingly, the extent of Plaintiffs' evidence at this stage is not an obstacle to conditional certification.

The Court has thus addressed the objections raised by Defendants and concluded that none of these grounds prevent conditional certification. However, even though the Court has found that Defendants' arguments do not bar the relief requested in the motion, the Court will continue to affirmatively consider whether the conditional certification is proper based upon all the requirements under the FLSA. Beginning with the scope of the proposed collective action, Plaintiff has limited the scope to Unloaders who were compensated based upon production within the three years preceding the filing of this action. While this may result in approximately 25,000 collective action members, Defendants have not expressly challenged any of the conditions defining the scope of the proposed collective action, and thus the Court recommends that there is nothing unreasonable about the proposed scope thereof.

**\*11** Next, the Court must squarely consider whether the proposed opt-in plaintiffs are similarly situated as it pertains to the FLSA violations alleged. As already discussed above, this does not require a consideration of all of the alleged disparate factual employment settings of the proposed opt-in plaintiffs at this stge. Yet, it does require a more limited analysis that examines whether the proposed opt-in plaintiffs are similarly situated as it pertains to the essence of the alleged FLSA violations—compensation. Plaintiff seeks to conditionally certify a collective action for those Unloaders that were compensated based upon production. Defendants have asserted that they have five separate compensation schemes and that their Unloaders could not be similarly situated on that basis. However, a more in-depth review of the five compensation schemes shows that all of them calculate an Unloaders' base, if not a total, compensation by production.

Considering the precise details of each scheme, the "Production Pay" system, as designated by Defendants', calculates each Unloader's compensation as a percentage of the Company's net revenue for each truck with different types of trucks having different values. (Gairhan Decl. ¶ 25). Specifically, each week, the Company adds up the amounts that each Unloader earned for all of his or her trucks and divides that amount by the total number of hours that he or she worked, which results in the Unloader's actual rate for the week. (*Id.* ¶ 27). The Modified Production Pay system calculates each Unloader's compensation in the same manner as the Production Pay system without different types of trucks having different values. (*Id.* ¶ 29). The Pool Pay system calculates each Unloaders based upon the Company's net revenue for the trucks unloaded and the number of production hours used by a group of Unloaders. (*Id.* ¶ 18). The Company puts this base production rate into a "pool" and then allocates a percentage of the pool to Unloaders based upon both their work time and their tenure. (*Id.* ¶ 18). The Hourly Pay and Lead Pay systems are used to determine compensation in addition to the compensation determined by either the Production Pay System, Modified Production Pay system, or Pool Pay System for non-unloading tasks and undertaking a lead role, respectively. (*Id.* ¶¶ 14, 30). Thus, ultimately, every Unloader's compensation is based upon production in some manner, and as Plaintiff alleges that proposed opt-in plaintiffs are similarly situated based upon compensation by production,

Slip Copy, 2014 WL 7187006 (W.D.Tenn.)
(Cite as: 2014 WL 7187006 (W.D.Tenn.))

the Court recommends that this weighs very heavily in favor of conditional certification.FN11

> FN11. Defendants argue that the various timekeeping methods utilized at different worksites and during different pay periods are also central to the similarly situated analysis. However, the Court finds that these are not because the method of committing an alleged FLSA compensation—whether by personal timesheet, sign-in sheet, or electronic scan—is not the issue. Instead, these considerations are more pertinent to the disparate factual employment settings at issue at the final certification case.

Finally, the Sixth Circuit has concluded that employees may also be similarly situated if the claims are "unified by common theories of defendants' statutory violations." *O'Brien,* 575 F.3d at 585. Plaintiff's Amended Complaint contains two simple theories of Defendants' statutory violations—failure to pay overtime wages in violation of Sections 207 and 2011 of the FLSA and failure to pay minimum wages in violation of Section 206 of the FLSA. The Court likewise finds the two straightforward theories of Plaintiff's allegations of Defendants' statutory violations weighs heavily in favor of conditional certification.

**\*12** Thus, upon final consideration of the similarly situated analysis utilizing the fairly lenient standard that typically results in conditional certification, the Court recommends that Plaintiff has made a modest factual showing that his position is similar to the positions held by other proposed opt-in plaintiffs. Nothing further is required at this first stage under the FLSA. Thus, it is recommended that Plaintiff's Motion to Certify be GRANTED.

Upon the recommendation that conditional certification is appropriate, the Court must further consider the manner of notice to be provided to the potential opt-in plaintiffs. The parties do not dispute that limited discovery of the potential opt-in plaintiffs' names, addresses, phone numbers, social security numbers, and e-mail addresses is appropriate, and thus it is recommended that such limited discovery is appropriate. The parties have not proposed any time period within which Defendants must provide this information, and thus the Court recommends that it must be provided within one month of the entry of this Report and Recommendation or, if objections are filed, within one month following the entry of the District Court's Order if it adopts the Report and Recommendation.

Next, the parties do not dispute that notice by first-class mail is appropriate, and thus it is recommend that notice by first-class mail shall be permitted. As to the substance of Plaintiff's proposed notice, *see* Mot. to Certify Exhs. 1 & 2, Defendants solely contest that the language is "inappropriate because it does not contain sufficient language regarding Defendants' position." However, Defendants have not proposed more suitable language, and thus it is recommended that the language of Plaintiff's proposed notice is appropriate.

The parties dispute whether the notice may be sent by email, whether a reminder postcard may be sent, the length of the opt-in period, and the impact of the statute of limitations on the scope of those to be notified. With respect to notification by email, it appears that the trend among district courts within the Sixth Circuit is to permit this method of notification in addition to notice by first-class mail. *See James Wolfram v. PHH Corp.,* No. 1:12–cv–599, 2012 WL 6676778, at \*4 (S.D.Ohio Dec. 21, 2012) ("Permitting transmission by mail and email to former employees ... helps ensure that all potential plaintiffs receive notice of their right to join this lawsuit."); *Tom Lewis v. The Huntington National Bank,* No. C2–11–CV–0058, 2011 WL 8960489, at \*2 (S.D.Ohio June 20, 2011) (permitting notification by email and first-class mail to help ensure potential plaintiffs receive at least one notification). Accordingly, as mailing addresses routinely change and email has become a pervasive form of communication, the Court recommends that notification by

email in addition to first-class mail is appropriate.

With respect to the proposed reminder postcard, Defendants argue that it is "unnecessary and potentially could be interpreted as encouragement by the court to join the lawsuit." *See Wlotkowski v. Michigan Bell Telephone Co.,* 267 F.R.D. 213, 220 (E.D.Mich.2010). Plaintiff argues that courts have permitted a reminder postcard "[p]articularly since the FLSA requires an opt-in procedure." *See Vasquez v. Coast Valley Roofing, Inc.,* 670 F.Supp.2d 1114, 1126 (E.D.Cal.2009). The Court believes that, given the language of the notice that clearly states that it is the individual's choice to act or not to act in response to the notice, the risk that a reminder postcard could be construed as any more encouragement by the court to join the lawsuit than the initial notice is low and is outweighed by the concern that all potential opt-in plaintiffs properly receive notification of the collective action. Accordingly, the Court recommends that Plaintiff be permitted to send one reminder postcard to the potential opt-in plaintiffs during the opt-in period.

***13** With respect to the length of the opt-in period, Plaintiff proposes a ninety-day period and Defendants propose a forty-five day period. Certain district courts within the Sixth Circuit have permitted a ninety-day period. *See Allison Shipes v. Amurcon Corp.,* No. 10–14943, 2012 WL 1720615, at *4 (E.D.Mich. May 16, 2012) (permitting a ninety-day opt-in period over defendant's objection because plaintiff's request for a ninety-day opt-in period had already been granted and defendant did not seek reconsideration); *Bruce Landsberg v. Acton Enterprises, Inc.,* No. C2–05–500, 2008 WL 2468868, at *1 (S.D.Ohio June 16, 2008). However, this Court has previously recognized that, when defendants challenge the length of the opt-in period, district courts generally grant a reduced period. *See Tiffany Montgomery v. Decatur County General Hosp.,* No. 1:11–cv–01096–JDB–egb, slip op. at 15 (W.D.Tenn. Mar. 19, 2012) (citing *Knispel v. Chrysler Group, LLC,* No. 1111886, 2012 WL 553622, at *8 (E.D.Mich. Feb. 21, 2012) (shortening period from ninety to forty-five days at defendant's request); *Miller v. Jackson,* No. 3:10–1078, 2011 WL 2197694, at *3 (M.D.Tenn. June 6, 2011) ("splitting the difference" and setting a period of seventy-five days)). Upon review, as the Court has recommended multiple means of notice including by first-class mail, by reminder postcard, and by email, the Court recommends that a sixty-day opt-in period is appropriate, "especially considering the statute of limitations concerns raised by [p]laintiff's counsel." *Montgomery,* No. 1:11–cv–01096–JDB–egb, slip op. at 15 (quoting *Knispel,* 2012 WL 553622 at *8). The Court recommends that the notice period shall begin upon receipt of the limited discovery of the proposed opt-in plaintiff's contact information as detailed above.

With respect to the impact of the statute of limitations on the scope of the notifications, as the Court will address below, *see, supra,* Section II.B, the Court declines at this time to toll the statute of limitations as to the potential opt-in plaintiffs. Further, Plaintiffs assert that Defendants' violation of the FLSA was willful, which would allow Plaintiff to collect damages within a three-year limitations period. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 134 (1988). It is not appropriate at this stage to address whether any alleged conduct was in fact willful; thus, the Court finds that notice should go to all individuals who were employed by Defendants during the three-year period preceding the entry of this Report and Recommendation or, if objections are filed, during the three year period preceding the entry of the District Court's Order if it adopts the Report and Recommendation.

**B. Motion to Toll**

With respect to Plaintiff's Motion to Toll, this Court has previously considered such a motion in an FLSA action. *See Tiffany Montgomery v. Decatur County General Hosp.,* No. 1:11–cv–01096–JDB–egb, slip op. at 15 (W.D.Tenn. Mar. 19, 2012). The Court stated that, while "equitable tolling is potentially available in an FLSA case, the doctrine is to be carefully ap-

plied." *Id.* (citing *Knispel,* 2012 WL 553622, at \*6). The *Montgomery* court clarified, though, that there has been uncertainty about applying the doctrine to as-yet identified potential opt-in plaintiffs. No. 1:11–cv–01096–JDB–egb, slip op. at 15. Thus, the *Montgomery* court declined to grant the relief requested at the outset but instructed that, "[i]f and when potential plaintiffs whose claims would otherwise be timebarred choose to opt into this class, they may apprise the Court of their circumstances and individually move for equitable tolling." No. 1:11–cv–01096–JDB–egb, slip op. at 15. The Court finds this approach to be most appropriate. Accordingly, Plaintiff's Motion to Toll is denied without prejudice.

### III. Conclusion

**\*14** For the reasons set forth herein, it is recommended that Plaintiff's Motion to Conditionally Certify Collective Action and Facilitate Notice to Potential Class Members (D.E.# 43) be GRANTED. Further, Plaintiff's Motion to Toll Statute of Limitations is DENIED without prejudice.

W.D.Tenn.,2014.
Kutzback v. LMS Intellibound, LLC
Slip Copy, 2014 WL 7187006 (W.D.Tenn.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.